AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

04/21/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cb _____ DEPUTY

United States of America

v.

BABAK BROUMAND,

Defendant.

Case No.    2:20-mj-01777

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. In or about the date of January 2015 to at least late September 2017, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Bribery of Public Official |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*MICHAEL TORBIC*
*Complainant's signature*

Michael Torbic, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     April 21, 2020

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Gail J. Standish, U.S. Magistrate Judge
*Printed name and title*

AUSA: Ruth Pinkel (213) 894-6077    REC: Detention

## Contents

I.     INTRODUCTION ...................................................................................1

II.    PURPOSE OF AFFIDAVIT...................................................................2

III.   SUMMARY OF PROBABLE CAUSE....................................................2

IV.    STATEMENT OF PROBABLE CAUSE..................................................5

       A.    Background on BROUMAND.......................................................5

       B.    BROUMAND's Corrupt Relationship with CW1 .......................7

             BROUMAND Queries Termendzhyan in FBI Database and Arranges
                Travel to Los Angeles Allegedly to Introduce Los Angeles
                Special Agent to a Potential Source............................................8

             BROUMAND Meets with Termendzhyan ..........................................10

             CW1 Purchases Ducati Motorcycle for BROUMAND in Exchange for
                Information on a Qatari Royal Family Member .....................11

             BROUMAND Provides CW1 Information on Solakyan...................12

             BROUMAND Queries Additional Names in FBI Database...............13

             BROUMAND Gives CW1 FBI Parking Placard.................................14

             BROUMAND Obstructs the Cisneros Investigation ..........................15

             BROUMAND Receives Regular Cash Bribe Payments.....................20

             Analysis of Cash Deposits into BROUMAND's Bank Accounts .......21

             BROUMAND Receives $30,000 Checks from CW1 in Violation of 18
                U.S.C. § 371 (Conspiracy to Commit Bribery of Public
                Official) and Commits At Least One Overt Act .....................24

             Cash Deposits to HB and ZA's Bank Account...................................26

             Additional Items of Value CW1 Provided to BROUMAND .............27

             BROUMAND Proposes Utilizing FBI Sources for Financial Gain ....28

             BROUMAND Proposes Using CW1 to Launder Gaddafi Money ......29

             BROUMAND Offers to Remove Individuals from the Terrorist
                Watchlist ..................................................................................30

i

C.    False Statements by BROUMAND ..........................................................30

False Statements on SFDF.....................................................................30

False Statements to FBI Special Agent Kusin ....................................32

False Statements to FBI Supervisory Special Agent Kelly ................33

False Statements to FBI Special Agent Adkins ..................................33

False Statements on a Union Bank Loan .............................................34

False Statements on an Equitable Mortgage Group Loan ..................36

D.    BROUMAND Underreports His Taxable Income....................................38

V.    NECESSITY FOR CELL-SITE AND GPS ORDER ..........................................39

VI.   CONCLUSION ....................................................................................................41

**AFFIDAVIT**

I, Michael Torbic, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2016.  I am a Certified Public Accountant ("CPA"), who prior to becoming a Special Agent with the FBI had been employed as a Financial Analyst and Auditor.  I am currently a member of the FBI's public corruption squad in Los Angeles, California.  The public corruption squad is responsible for conducting investigations of violations of criminal laws involving elected and non-elected public officials and major frauds committed against the United States.

2.      Since joining the FBI in January of 2016, I have received training in the investigation of violations of criminal law, such as public corruption, fraud against the government, money laundering, and financial crimes, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia.  During the time that I have been employed by the FBI, I have conducted and participated in numerous investigations relating to the corruption of public officials, bribery, money laundering, and major frauds against the United States.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.  I have interviewed and/or debriefed defendants, informants, and other witnesses who had personal knowledge regarding the investigations in which I have been involved.  I have also worked closely with, and learned from, other senior FBI Agents who are experienced in investigating criminal cases, conducting arrests, executing search warrants, and identifying, acquiring, and seizing evidence in criminal cases.  I have also served as an affiant for affidavits in support of criminal complaints, search warrants, seizure warrants, and arrest warrants.

## II.   <u>PURPOSE OF AFFIDAVIT</u>

3.      This affidavit is made in support of an application for a criminal complaint and arrest warrant for BABAK BROUMAND for a violation of 18 U.S.C. § 371 (conspiracy) (the "Target Offense") for his participation in a conspiracy to commit bribery of a public official in violation of 18 U.S.C. § 201, which occurred between in or about January 2015 and to at least the end of September 2017.

4.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of reports prepared by other law enforcement agents, including Special Agents from FBI, the Internal Revenue Service Criminal Investigations ("IRS-CI"), the Department of Justice Office of Inspector General ("DOJ OIG"), my discussions with IRS-CI and DOJ OIG Special Agents.  This affidavit is intended to show merely that there is probable cause to believe BROUMAND committed the Target Offense and does not purport to set forth all my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.   <u>SUMMARY OF PROBABLE CAUSE</u>

5.      During all times relevant to this affidavit:

a.      BROUMAND was employed as a Special Agent with the FBI, until his retirement in January 2019.  BROUMAND was responsible for National Security investigations; specifically BROUMAND was responsible for recruiting human intelligence ("HUMINT") sources for the FBI.  As a Special Agent with the FBI, BROUMAND was a public official.

b.      Cooperating Witness 1 ("CW1")[1] is believed by the FBI to have occupied a role in a criminal enterprise that included suspected members and associates of an Armenian

---

[1] According to NCIC, CW1's criminal history includes charges for Speeding, Reckless Driving, Failure to Provide Financial Responsibility, and Driving Under the Influence.  CW1 has agreed to cooperate in this investigation because CW1 would like the federal government to take CW1's cooperation into consideration when addressing certain illegal acts CW1 has admitted to committing.  CW1 has acknowledged making bribe payments to BROUMAND, as is outlined

Organized Crime group based in Southern California, including Levon Termendzhyan

("Termendzhyan")[2]; Felix Cisneros ("Cisneros")[3], then a Special Agent with Homeland Security

_____

further in this affidavit.  CW1 has also admitted to additional illegal acts, including making bribe payments to another Federal Agent, engaging in a credit card fraud conspiracy, and participating in unlicensed marijuana cultivation.  CW1 has also lied to Federal Agents in relation to this, and other, investigations, but then later admitted that CW1 lied and withheld information. Throughout CW1's cooperation, Agents believe CW1 may have withheld information regarding CW1's relationship with BROUMAND and others, as well as CW1's involvement in other potential illegal acts.  The FBI has not paid CW1 any money, nor has the FBI promised to pay any money in exchange for CW1's cooperation.  Despite the belief that CW1 may be withholding information, I have found the information CW1 has provided about BROUMAND that is detailed in this affidavit to be reliable, because much of it has been corroborated by our investigation.  Additionally, although it appears CW1 is withholding some information, I have no reason to believe that CW1 is fabricating the incriminating information that CW1 has provided to the FBI.  CW1 has agreed, in principal to sign a plea agreement admitting, among other things, his guilt to bank fraud, false statements, and his bribery of BROUMAND and another Federal Agent, while both were still Federal Agents.  No plea agreement has been publicly filed.

[2] On August 1, 2018, Termendzhyan, also known as Lev Aslan Dermen, was indicted in the District of Utah on nine counts of 26 U.S.C § 7206(2) (aiding and assisting in the filing of a false return), five counts of 18 U.S.C. § 1956 (money laundering), and one count of 18 U.S.C. § 1957 (money laundering).  (U.S. v. Termendzhyan, CR 18-365-JNP.)  On or about August 27, 2018, Termendzhyan was arrested by Federal Agents assigned to the FBI's Los Angeles Eurasian Organized Crime Task Force ("LA-EOCTF").  On March 16, 2020, following a jury trial, Termendzhyan was convicted in the District of Utah on one count of 18 U.S.C § 1349 (conspiracy), seven counts of 18 U.S.C. § 1956 (money laundering), and two counts of 18 U.S.C. § 1957 (money laundering).  Termendzhyan has not yet been sentenced.

[3] On March 22, 2017, Cisneros was arrested on a complaint for violating 8 U.S.C. § 1327 (aiding and assisting an inadmissible alien to enter the United States).  On April 21, 2017, Cisneros was indicted on one of 18 U.S.C. § 1327.  On December 19, 2017, the grand jury returned a superseding indictment charging Cisneros with seven counts: one count of 18 U.S.C. § 371 (conspiracy); one count of 18 U.S.C. § 205(a)(2), 216(a)(2) (public official prosecuting claim affecting the United States); one count of 18 U.S.C. § 1519 (falsification of records); two counts of 18 U.S.C. § 1001 (false statements); and two counts of 18 U.S.C. § 1512(b)(3) (tampering with a witness, victim, or informant and obstruction of justice).  (U.S, v. Felix Cisneros, Jr., CR 17-0229-CAS.)  On April 23, 2018, following a jury trial, Cisneros was convicted of one count of 18 U.S.C. § 205(a)(2), 216(a)(2) (public official prosecuting claim affecting the United States); one count of  18 U.S.C. § 1519 (falsification of records); and two counts of 18 U.S.C. § 1001 (false statements).  In November 2018, Cisneros was sentenced to twelve months and one day in the custody of the Bureau of Prisons.

Investigations ("HSI"); and John Balian ("Balian")[4], then a Detective with the Glendale Police Department.

6.     In violation of 18 U.S.C. 371 (conspiracy), starting in approximately January 2015, and continuing through at least late September 2017, BROUMAND began participating in a conspiracy with CW1 to commit bribery of a public official in violation of 18 U.S.C. § 201.  In exchange for bribe payments averaging approximately $10,000 a month from CW1, BROUMAND and CW1 conspired and agreed that BROUMAND would perform official acts and omit to do acts, query law enforcement databases, provide CW1 with non-public law enforcement sensitive information and protection, and assist CW1 in CW1's efforts to evade detection by law enforcement.  This conduct violated BROUMAND's duties and responsibilities as a federal law enforcement officer, including the duty to faithfully investigate potential criminal activity.   On or about September 30, 2015, BROUMAND deposited a $30,000 bribe payment from CW1, in the form of a cashier's check.  This check represented approximately three (3) months of bribe payments from CW1 in exchange for BROUMAND querying law enforcement databases and providing CW1 with non-public information.

7.     In order to conceal the true source and purpose for the payment, the cashier's check from CW1 was purchased from an account in the name of Andor'e Inc., a hair salon to which CW1 had lent money.  BROUMAND further concealed the true source and purpose for the payment by depositing the cashier's check into his Love Bugs business checking account, which was also a hair salon-related business.  After transferring the bribe proceeds through several accounts, BROUMAND used the bribe money as part of the down payment for a second residence in the Lake Tahoe, California area.

_____

[4] On May 15, 2018, Balian was arrested on a complaint for violating 18 U.S.C. § 1001 (false statements).  Balian was charged by information and entered a plea of guilty to one count of 18 U.S.C. § 666 (federal program bribery), one count of 18 U.S.C. § 1512(c)(2) (obstruction of justice), and one count of 18 U.S.C. § 1001 (false statements).  (U.S. v. John Saro Balian, CR 18-345-JFW.) In March 2019, Balian was sentenced to 21 months in the custody of the Bureau of Prisons and three years of supervised release.

8.     There is also probable cause to believe that BROUMAND committed one or more violations of the following: 18 U.S.C. § 201(b)(2)(A) and (C) (bribery of public officials); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statement to a government agency); 18 U.S.C. § 1014 (false statement on loan application); 18 U.S.C. § 1956 (laundering of monetary instruments); 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity); 18 U.S.C. §§ 1510, 1512, 1519 (obstruction of justice); 26 U.S.C.§ 7206(1) (subscribing to a false tax return); and 31 U.S.C. § 5324 (structuring financial transactions to avoid reporting requirements).

## IV.   STATEMENT OF PROBABLE CAUSE

### A.     Background on BROUMAND

9.     BROUMAND was employed by the FBI as a Special Agent in the San Francisco Division.  BROUMAND had been an FBI Special Agent since 1999, until his retirement on January 4, 2019. [5]  According to his employment records with the FBI, BROUMAND attended Western State University College of Law in Fullerton, California and graduated in 1993.

10.     According to publicly available records, since 2007 BROUMAND and his wife have owned a lice treatment salon named Love Bugs, LLC ("Love Bugs").  According to Love Bugs' website (lovebugslice.com), Love Bugs will discretely take care of your lice problem with a non-toxic lice-removal technique and special formula that was invented in Greece over 40 years ago.  Love Bugs' had operated two locations, the Lafayette Salon located at 3746 Mount Diablo Boulevard, Suite 122, Lafayette, California 94549 (the "Lafayette Salon") and the Los Altos Salon located at 1148 Riverside Drive, Los Altos, California 94024 (the "Los Altos Salon").

11.     According to publicly available records, the Los Altos Salon had been operating without an appropriate license from the city of Los Altos and ceased operations in approximately

_____

[5] BROUMAND was placed on administrative leave from the FBI in December 2018, after search warrants were executed at his residence and businesses.  BROUMAND formally retired on January 4, 2019, after becoming eligible to retire from the FBI with full retirement benefits.

June 2019.  According to documents filed with the California Secretary of State, in January 2020, the Lafayette Salon began operating under a new name, LoveBugs Lice Removal LLC, and listed a former employee of BROUMAND's, EL, as the organizer and agent for service.  I believe that BROUMAND closed the Love Bugs Los Altos Salon and reorganized the Lafayette Salon after search warrants were executed at the businesses,[6] because BROUMAND knew that Love Bugs had been used by BROUMAND to launder bribe payments from CW1 and underreport his income to the IRS, as detailed further in this affidavit.  Additionally, BROUMAND used Love Bugs to pay for a significant amount of personal expenses.[7]

12.     Based upon my review of the relevant records, as well as my discussions with other members of the investigative team who have also reviewed records in this case, BROUMAND appears to have been in charge of much of the finances for Love Bugs. BROUMAND prepared the tax returns and sales and use tax returns for Love Bugs. BROUMAND also appears to have conducted most of the banking activity, including making deposits and writing checks.

13.     BROUMAND and his wife also owned a real estate business named Killer Bees Management, LLC ("Killer Bees"), and a yacht chartering business named MB3 Investments, LLC ("MB3").

---

[6] On December 8, 2018, search warrants were executed by the IRS, FBI, and DOJ OIG at BROUMAND's residence, the Love Bugs Los Altos Salon, and the Love Bugs Lafayette Salon.

[7] An analysis of Love Bugs' American Express account number ending 1001 between November 2015 and October 2018 revealed over 60% (approximately $300,000) of the charges were personal expenses.  An analysis of Lovebugs' JPMorgan Chase Credit Cards accounts ending in 0750, 3308, and 9066 between November 2011 and September 2018 revealed approximate 68% (approximately $329,000) of the charges were personal expenses. Additionally, analysis of LoveBugs' JPMorgan Chase Business Select Checking account ending in 8236 between January 2015 and October 2017 revealed approximately 20% (approximately $387,000) of the expenditures were personal expenses.  Personal expenditures from these accounts include payments to Obexer's Boat Company, Southern California Motorcycles, Cole European, Sonnen Porsche, Beverly Hills Watch Company, Santia Exquisite Jewelry, Canyon Sports, Atlantic Firearms, Neiman Marcus, Nordstrom, Coach, Lululemon, Yu's Martial Arts, Southwest Airlines, Homewood Mountain Resort, Sheraton Kauai Resort, and Flemings Restaurant.

B.      **BROUMAND's Corrupt Relationship with CW1**

14.     According to CW1, BROUMAND first met CW1 in September 2014 at the Grand Havana Room, a private, members-only cigar lounge in Beverly Hills, California.  BROUMAND was introduced to CW1 by a partner at CW1's law firm, who had attended law school with BROUMAND.  CW1 told me that in November 2014, CW1 hosted a party at a house CW1 had rented in Las Vegas, Nevada, and invited BROUMAND as a guest.  CW1 noticed that BROUMAND had expensive tastes in terms of his style, his interests, and his affinity for luxury goods and services.  CW1 noted that BROUMAND was wearing a gold Rolex watch and Gucci belt.  According to CW1, CW1 saw this as an opportunity to recruit BROUMAND to help CW1 evade detection by law enforcement.  CW1 began cultivating a friendship with BROUMAND, and the relationship turned corrupt in the beginning of 2015.  It was during these conversations that CW1 informed BROUMAND that CW1 was engaged in criminal activity.  CW1 told me that during a discussion regarding BROUMAND's FBI salary, CW1 asked BROUMAND if he would be willing to "do something on the side" to make some additional money, an offer that BROUMAND accepted.  Starting in early 2015, CW1 began paying BROUMAND approximately $10,000 per month for information and protection.  CW1 initially asked BROUMAND to search CW1's name in a FBI database.  If there was law enforcement interest in CW1, CW1 requested that BROUMAND attempt to "defuse" the interest in CW1.

15.     CW1 said that he and BROUMAND originally devised a scheme in which BROUMAND would document CW1 as an official FBI source.  BROUMAND would then be able to falsely justify his queries in law enforcement databases as official FBI business.  BROUMAND informed CW1 that he was in the process of getting CW1 approved as a FBI source, but BROUMAND had learned that there had been an investigation into CW1 in 2008 or 2009.  BROUMAND told CW1 that the FBI had been looking at CW1 and CW1's spouse for credit card fraud, but the investigation had been closed and the FBI Case Agent had transferred offices.  CW1 told me that the existence of the investigation corroborated the value of the information that BROUMAND was providing to CW1, as there was no way BROUMAND could

know about the specific credit card account and investigation without looking up CW1 in a law enforcement database.

16.     The FBI has audited BROUMAND's use of FBI databases.  Based upon these results, I determined that on or about January 8, 2015, BROUMAND queried CW1 in the FBI case management database.  BROUMAND's query returned positive results in a FBI Los Angeles control file.  The documents viewed in the control file by BROUMAND included allegations of credit card fraud committed by CW1, information that BROUMAND appears to have shared with CW1.

BROUMAND Queries Termendzhyan in FBI Database and Arranges Travel to Los Angeles Allegedly to Introduce Los Angeles Special Agent to a Potential Source

17.     According to CW1, in approximately January 2015, CW1 requested that BROUMAND query Termendzhyan in the FBI database.  CW1 had been working for and with Termendzhyan.  Based on my review of an audit of the FBI's case management database, on January 8, 2015, BROUMAND queried Termendzhyan, CW1, and the names of several other individuals and entities associated with Termendzhyan in the FBI database.  BROUMAND's searches in the FBI database returned positive results in a FBI Los Angeles case file that named Termendzhyan as the main subject of the investigation.  According to toll records I have obtained and reviewed, BROUMAND called CW1 within an hour of accessing the Termendzhyan case file.  According to CW1, BROUMAND informed CW1 that his query for Termendzhyan in the FBI database had "rang all the bells," and that BROUMAND needed to come to Los Angeles to clear it up.

18.     I have reviewed BROUMAND's FBI emails.  On January 9, 2015, BROUMAND emailed the Case Agent for the FBI Los Angeles investigation on Termendzhyan, FBI SA Stephen Kusin.  In the email, BROUMAND requested a call with SA Kusin and told SA Kusin that he was a HUMINT Agent in San Francisco, who had information that might be useful regarding the Termendzhyan investigation.  SA Kusin agreed to meet with BROUMAND and a potential source in Los Angeles.  The database audit shows that BROUMAND continued to

access the FBI case file on Termendzhyan between January 8, 2015 and January 26, 2015, and exchanged numerous phone calls and text messages with CW1.  Based upon my review of his records, I know that on January 22, 2015, BROUMAND submitted a payment request to the FBI for an advance of funds to cover the costs of flying to Los Angeles for the stated purpose of "assist[ing] LA division with source recruitment."

19.     According to travel records submitted to the FBI, BROUMAND flew from Oakland, California to Los Angeles, California on Friday, January 30, 2015, and took an Uber black car from Los Angeles International Airport ("LAX") to the FBI Los Angeles Field Office ("LAFO").  SA Kusin informed me that he met BROUMAND in a cafeteria near the FBI LAFO. SA Kusin noted that BROUMAND did not look like an FBI Agent and was wearing a three-piece suit and jewelry, including a bracelet and cufflinks.  SA Kusin had originally intended to go with BROUMAND to meet the potential source that had information regarding Termendzhyan.  However, BROUMAND told SA Kusin that he would meet with the potential source first and call SA Kusin if the potential source was willing to meet with SA Kusin.  SA Kusin told me that after not hearing from BROUMAND for several hours, he began calling BROUMAND, but all of his calls went unanswered.  SA Kusin received a call from BROUMAND in the late afternoon.  BROUMAND informed SA Kusin that he was already at LAX getting ready to fly back to San Francisco, and that the potential source did not want to cooperate with the FBI, because they feared that their name would get out in the community.

20.     I learned from my conversations with CW1 that on this trip, after BROUMAND's meeting with the Los Angeles FBI, CW1 picked BROUMAND up from the FBI LAFO in CW1's Bentley.  CW1 believed BROUMAND met with the Los Angeles FBI to clear up the issues that resulted from BROUMAND having queried Termendzhyan in the FBI database. BROUMAND informed CW1 that it was a "tough one" and that they had "barely got away with this one" as the Los Angeles FBI wanted to talk to CW1.  CW1 told me that CW1 was willing to meet with the Los Angeles FBI regarding Termendzhyan, but BROUMAND advised CW1 to not meet with FBI.  BROUMAND did not provide CW1 with specific details regarding the

9

investigation into Termendzhyan, but BROUMAND told CW1 that CW1 should stay away from Termendzhyan.  According to CW1, despite BROUMAND never explicitly stating that Termendzhyan was the subject of a FBI investigation, CW1 understood BROUMAND's warning to stay away from Termendzhyan to mean that Termendzhyan was under FBI investigation.

21.    CW1 told me that CW1 often paid for hotel rooms for BROUMAND to stay at when he was in Los Angeles, but did not recall if BROUMAND had stayed in Los Angeles on this specific trip.  CW1 recalled paying for BROUMAND to stay at the Montage Beverly Hills Hotel, the Beverly Wilshire Hotel, the Beverly Hills Hotel, and CW1 also had a penthouse in Beverly Hills where BROUMAND stayed.  According to hotel records I obtained, CW1 paid $1,505.48 for a hotel room at the Montage Beverly Hills Hotel from January 30, 2015 until February 1, 2015, and listed BROUMAND as an accompanying guest on the reservation.  According to cell-site data from BROUMAND's FBI cell phone, which I also obtained and analyzed, BROUMAND stayed in Beverly Hills, California from Friday, January 30, 2015 until Sunday, February 1, 2015 when BROUMAND flew back to Oakland, California.

22.    According to payment requests submitted to the FBI, which I have reviewed, BROUMAND flew from Oakland to Los Angeles on January 30, 2015, with a return flight from Los Angeles to Oakland on February 1, 2015.  BROUMAND also submitted to the FBI for reimbursement, the cost of the Uber black car that BROUMAND took from LAX to the FBI LAFO.  However, BROUMAND did not submit any other payment requests or receipts for expenses incurred as a result of this trip, to include lodging and additional transportation costs.  BROUMAND did not have any other documented official FBI travel to Los Angeles after this date.

BROUMAND Meets with Termendzhyan

23.    After BROUMAND queried Termendzhyan in the FBI Database, and advised CW1 that Termendzhyan was under investigation, CW1 orchestrated a meeting between BROUMAND and Termendzhyan.  CW1 did not recall if the meeting was on this same trip, but CW1 knew that it occurred within days or weeks of BROUMAND learning of the FBI

investigation into Termendzhyan, and after BROUMAND had met with the Los Angeles FBI

Case Agent investigating Termendzhyan.  BROUMAND, CW1, and Termendzhyan met at Ten

Pounds Bar in the Montage Beverly Hills Hotel.  CW1 believed that Termendzhyan was

intimidated that CW1 had corrupted an FBI Special Agent, as Termendzhyan had a history of

corrupting law enforcement, but according to CW1, did not have a FBI Special Agent on his

"payroll."  CW1 told me that Termendzhyan attempted to "emotionally destroy" BROUMAND,

and had told BROUMAND that he could take his gun and badge away.  CW1 told me that

Termendzhyan paid for the meal.

> CW1 Purchases Ducati Motorcycle for BROUMAND in Exchange for Information on a
> Qatari Royal Family Member

24.     CW1 told me that he provided security for a Qatari Royal Family Member

("QRFM"), and assisted QRFM, who had a drug habit, purchase Demerol, a Schedule II narcotic

controlled substance.  CW1 said he first met QRFM in early April 2015.  After this meeting,

CW1 requested that BROUMAND research QRFM, because CW1 wanted to know if QRFM

was associated or involved in terrorism, terrorism financing, or was on a terrorist watch list.

CW1 informed BROUMAND that CW1 was planning to purchase narcotics for QRFM.

According to CW1, CW1 had possession of QRFM's passport and visa, as CW1 was also

assisting QRFM purchase and insure a Lamborghini and a Porsche 911.  CW1 told me that CW1

showed the passport to BROUMAND, and BROUMAND took a picture of the passport.  While

CW1 was listening, BROUMAND also spoke with QRFM on the telephone, and they discussed

a New York FBI Special Agent that BROUMAND and QRFM both knew.  BROUMAND later

told CW1 that QRFM was "okay," which CW1 understood to mean that QRFM was not

associated with terrorism and had not attracted the attention of law enforcement.  As such, CW1

could engage in illicit business with QRFM without fear of attracting the attention of law

enforcement. (Investigators have not yet located a search for QRFM, but have not audited all

possible databases to which BROUMAND had access, to include watch lists.)

11

25.     CW1 said that he used money earned from CW1's business dealings with QRFM to purchase a Ducati motorcycle for BROUMAND as a "bonus" for looking up and determining if QRFM had attracted the attention of law enforcement.  On or about April 29, 2015, CW1, BROUMAND, and CW1's friend, went to Beverly Hills Ducati to purchase the motorcycle for BROUMAND.  I have reviewed dealership records, which show that CW1 purchased a 2015 Ducati Panigale motorcycle, helmet, and accessories totaling approximately $36,000, which CW1 charged to a credit card.  The dealership records contain a photocopy of BROUMAND's driver's license and the purchase paperwork contains BROUMAND's name.  According to California Department of Motor Vehicle ("DMV") records, BROUMAND registered the motorcycle in his name, on or about May 13, 2015.

26.     After becoming aware of the presence of a DOJ OIG investigation[8] into BROUMAND, on or about October 20, 2018, BROUMAND sold the Ducati Panigale motorcycle to Ace Motorsports.  I believe that BROUMAND sold the Ducati motorcycle after becoming aware of the DOJ OIG investigation in an attempt to further conceal the nature of his corrupt relationship with CW1, because BROUMAND knew that the Ducati motorcycle was a bribe payment from CW1 for information BROUMAND provided regarding QRFM.

        BROUMAND Provides CW1 Information on Solakyan

27.     CW1 informed me that CW1 had asked BROUMAND to look up another member at the Grand Havana Room, Sam Solakyan. ("Solakyan").  According to CW1, BROUMAND told CW1 to "stay away from him" and that Solakyan was "trouble."  Based on my review of an audit of the FBI's case management database, on December 8, 2015, BROUMAND queried Solakyan in the FBI database.  BROUMAND's search returned positive results in a San Diego

---

[8] On or about March 12, 2018, BROUMAND was served with notice from the DOJ OIG that an investigation had been initiated regarding allegations that BROUMAND misused government property, lacked candor to the FBI, and omitted information in his SFDF (Security Financial Disclosure Form).  The investigation was then administrative in nature.

FBI Healthcare Fraud investigation involving Solakyan.[9]  CW1 told me that BROUMAND was right, and that Federal Agents arrested Solakyan in September 2018, validating the information that BROUMAND had provided CW1.

BROUMAND Queries Additional Names in FBI Database

28.     According to CW1, BROUMAND queried between ten (10) and twenty (20) names in law enforcement databases at CW1's request.  CW1 typically provided BROUMAND with the names of individuals that CW1 intended to engage in a business relationship with, to include both legal and illegal businesses.  BROUMAND would not typically provide detailed information regarding these individuals and would only inform CW1 if they were "okay" or if CW1 should "stay away" from that person, which CW1 understood to mean that the individual had attracted the attention of law enforcement.

29.     According to CW1, CW1 asked BROUMAND to look up an associate of Termendzhyan, BK.  Based on my review of an audit of the FBI's case management database, on four (4) separate occasions (January 8, 2015; December 23, 2015; May 23, 2016; and May 24, 2016), BROUMAND queried BK in the FBI case management database.  On or about December 7, 2015, BROUMAND queried an associate of CW1, CP, in the FBI case management database. CW1 told me that CW1 thought CP may have attracted the attention of law enforcement, and asked BROUMAND to run CP in a law enforcement database.  BROUMAND told CW1 that CP "was okay," which CW1 understood to mean that CP had not attracted the attention of law enforcement.

30.     As a result of my conversations with CW1, I understand that after BROUMAND's FBI parking placard was seized from CW1 by Burbank PD, as detailed below in paragraphs 31 to 34, BROUMAND and CW1 agreed that if their relationship was ever

---

[9] On September 25, 2018, Solakyan, was indicted in the Southern District of California on one count of 18 U.S.C § 1349 (conspiracy) and eleven counts of 18 U.S.C. § 1341, 1346 & 2 (honest services mail fraud & aiding and abetting). (U.S. v. Solakyan, CR 18-4164-BAS.)  On or about September 26, 2018, Solakyan was arrested by Special Agents of the FBI.  Solakyan is currently awaiting trial in the Southern District of California.

questioned by law enforcement, they would say that CW1 was providing "intelligence" information to BROUMAND, in order to justify the queries being run by BROUMAND. According to CW1, BROUMAND told CW1 that if questioned, CW1 should name BK, CP, and QRFM, and say that CW1 was providing BROUMAND with information about these individuals.  CW1 told me that CW1 had no intention of providing "intelligence" information to the FBI.

### BROUMAND Gives CW1 FBI Parking Placard

31.     According to a report from the Burbank, California Police Department ("PD"), on or about February 27, 2016, Burbank PD conducted a traffic stop on a black Cadillac Escalade for not having any license plates in violation of California Vehicle Code § 5200 (a).  CW1 was riding in the front passenger seat of the vehicle.  CW1 and the driver both acknowledged the car had no license plates.  CW1 told the officer that the reason the car did not have license plates is that it was sometimes used for law enforcement purposes.  In response to the officer's question about what type of law enforcement purposes, CW1 handed the officer a FBI parking placard containing the FBI seal, which had BROUMAND's FBI business card taped to the back. According to the Burbank PD report, CW1 told the officer that BROUMAND had used the car a couple of days earlier and had left the placard behind.  When the officer asked CW1 if CW1 had made an attempt to return the placard, CW1 responded "not my problem."

32.     According to the report from Burbank PD, the Burbank PD officer called the number on BROUMAND's business card, which was the number for the FBI San Francisco Field Office ("SFFO"), and spoke to FBI SA Jeffrey Chisholm.  According to the report from Burbank PD, SA Chisholm then spoke to BROUMAND, who confirmed he had left the placard behind.  Based on my review of an interview report with BROUMAND's supervisor, Supervisory Special Agent ("SSA") Jonathan Kelly, BROUMAND informed SSA Kelly that he had given CW1 the placard but did not provide a clear explanation as to the reason BROUMAND gave the placard to CW1.  According to interview report, BROUMAND told SSA Kelly that he was off-duty, visiting a family friend in Los Angeles, HM, who had introduced

14

BROUMAND to CW1.  BROUMAND claimed that he was using his relationship with HM to develop potential sources for the FBI.

33.     CW1 admitted to me that CW1 lied to Burbank PD officers regarding the reason the FBI placard was in his vehicle.  CW1 told me that BROUMAND had in fact given CW1 the FBI parking placard.  According to CW1, CW1 had told BROUMAND that CW1 loved how Federal Agents could park wherever they wanted, and how CW1 wished CW1 could do the same.  The next time BROUMAND visited Los Angeles, he gave the FBI parking placard to CW1.  According to CW1, CW1 displayed the FBI placard on the dashboard of his vehicle once at the parking garage of the Grand Havana Room, where BROUMAND had given CW1 the placard, and once for approximately three (3) hours at a red curb in front of CW1's office.

34.     CW1 admitted to me that CW1 had intentionally displayed the FBI parking Placard to the Burbank PD officer in an attempt to use the FBI parking placard to get out of trouble.  According to CW1, CW1 called BROUMAND while the Burbank PD Officers were still present.  CW1 said that CW1 had informed BROUMAND that the officers had taken the placard, and BROUMAND told CW1 to have the officers call him.  The Burbank PD officer did not call BROUMAND, and FBI leadership in Los Angeles and San Francisco were notified that BROUMAND's FBI parking placard had been seized from CW1.

        BROUMAND Obstructs the Cisneros Investigation

35.     Based on my review of an audit of the FBI's case management database, on May 23, 2016, BROUMAND queried the names of individuals and entities associated with CW1 and Termendzhyan in the FBI case management database, and again accessed the Termendzhyan case file.  On May 24, 2016, BROUMAND again queried the names of additional CW1 and Termendzhyan associates, including Cisneros, the-then HSI special agent referenced in footnote 3. BROUMAND's query of Cisneros returned positive results on a restricted FBI Los Angeles case file that named Cisneros as the main subject of the investigation.  Despite the Cisneros case file being restricted, BROUMAND was still able to view certain case information, and identify

15

FBI SA Brian Adkins as the FBI Case Agent.[10]  BROUMAND continued to access the FBI case

files on Termendzhyan and Cisneros through June 24, 2016.

      36.     Based on my review of BROUMAND's FBI emails, I know that on May 24,

2016, BROUMAND sent an email to FBI SA Adkins, who responded to BROUMAND on May

26, 2016.  SA Adkins informed me that he spoke with BROUMAND via telephone on May 26,

2016.  BROUMAND informed SA Adkins that he had attended a party in Beverly Hills,

California the previous weekend to celebrate CW1 passing the California State Bar Exam.

BROUMAND identified CW1 as a personal friend and a close associate of Termendzhyan.

According to SA Adkins, BROUMAND noted that Termendzhyan was an individual alleged to

be involved in Armenian Organized Crime.  BROUMAND stated that CW1 had attempted to

broker a meeting between BROUMAND and Termendzhyan in the past so that BROUMAND

could recruit Termendzhyan as a FBI source.

      37.     BROUMAND informed SA Adkins that he ran into Cisneros at the party, and

without prompting, described Cisneros as the target of SA Adkins' investigation.  BROUMAND

explained that Cisneros was a friend of CW1.  According to SA Adkins, BROUMAND claimed

to have witnessed Cisneros consume multiple alcoholic drinks while at the party.  When asked

by SA Adkins if he had witnessed Cisneros do or say anything that appeared suspicious,

BROUMAND replied that there was nothing specific that Cisneros had said or done.

BROUMAND stated that he had a "sixth sense" about Cisneros that caused him to search

Cisneros' name in the FBI case management database, which resulted in positive hits on the SA

Adkins's restricted FBI case file.

---

[10] Restricted FBI case files are returned in search results with the FBI case number, the serial number of the document that returned the positive result, the type of document, and the date the document was serialized, but the title and the content of the document are replaced with "RESTRICTED – Access Denied."  I understand that BROUMAND would have been able to deduce that Cisneros was the subject of the FBI investigation, as the search result would have returned numerous serials in the restricted case file, including the first serial, which is almost always a case opening document.  Additionally, the initial digits in the FBI case number for the Cisneros investigation indicated that the investigation was focused on "Corruption of Federal Public Officials – Border Related – Other" matters.

38.     According to SA Adkins, BROUMAND did not articulate a reasonable basis for conducting a search of Cisneros in the FBI database.  SA Adkins became increasingly suspicious of BROUMAND's motives in calling him, and at the end of their telephone conversation, SA Adkins asked BROUMAND to draft a FD-302[11] regarding his interaction with Cisneros.  Based on my review of the Cisneros' case file, instead, one month later, on or about June 24, 2016, BROUMAND drafted a FD-1057[12] regarding his interactions with Cisneros at the party and serialized (officially added) the document to SA Adkins's case file.  According to SA Adkins, BROUMAND's failure to draft a FD-302 regarding the interaction with Cisneros also raised SA Adkins' suspicions.

39.     SA Adkins told me that he believed BROUMAND might have had at least two reasons for calling him.  The first reason being that BROUMAND was aware that his search of Cisneros and accessing SA Adkins's case file would leave a record of that search, so the call was an attempt to cover his tracks and make up an excuse for having made the database inquiry.  The second reason being that BROUMAND was seeking confirmation that Cisneros was in fact the target of SA Adkins' investigation, and that BROUMAND was attempting to elicit additional information regarding, Cisneros, CW1, Termendzhyan, and others from SA Adkins.

40.     SA Adkins also stated that there was a negative impact on his investigation.  First, due to his suspicions about BROUMAND's interest in the investigation, the undercover aspect of the investigation was temporarily paused and slowed down due to safety concerns for the Confidential Human Source ("CHS").  SA Adkins also said that Cisneros' demeanor changed in between two undercover meetings with the CHS.   Prior to his contact with BROUMAND, on May 12, 2016, there had been a meeting between a CHS and Cisneros in which Cisneros made several incriminating statements.

41.     I have reviewed a translated transcription of the May 12, 2016 meeting between Cisneros and the CHS, which was conducted in a mix of Spanish and English.  The CHS, who

---

[11] An FD-302 is a FBI report of investigative information that may become testimony.
[12] An FD-1057 is an electronic communication typically used by the FBI to document administrative matters associated with an investigation.

had immigration issues, stated that Cisneros had previously assisted the CHS in reentering the United States from Mexico at the request of Termendzhyan.  During this meeting the CHS was again seeking Cisneros' assistance in crossing the border.  Cisneros stated that "…it won't happen the same way.  There's too much fucking dirt after the fact.  You see what I'm saying?  And that's the problem."  I understand this to mean that Cisneros was willing to again assist the CHS in reentering the United States from Mexico, but that they would need to use a different method than the previous time, as they had generated too much attention.  Later in the conversation Cisneros suggests that they can fly the CHS across the border in a helicopter instead.

42.     At the end of the conversation between the CHS and Cisneros on May 12, 2016, Cisneros tells the CHS, "And then, fool, I'm telling you…if you say something, dude, I'll bury you, dude, honestly…I mean, [I swear it] on my mother."  I understand this statement to reflect Cisneros' consciousness of guilt in agreeing to assist the CHS in traveling to and from Mexico.  I believe that Cisneros was aware that he had violated the law by assisting the CHS in crossing the border and was agreeing to do so again, and that Cisneros was threatening the CHS in order to silence the CHS from telling anyone about Cisneros' illegal conduct.

43.     The next meeting between the CHS and Cisneros occurred on August 30, 2016, after the pause in the investigation following BROUMAND's telephone conversation with SA Adkins.  I was part of the surveillance team that observed the meeting between the CHS and Cisneros, and also reviewed a translated transcription of the August 30, 2016 meeting that was conducted in a mix of Spanish and English.  There were two significant conclusions, among others, to be drawn from the meeting.  First, Cisneros was engaging in counter-surveillance during the meeting.  Second, Cisneros' behavior was markedly different from the May 12, 2016 meeting.

44.     I have reviewed the surveillance notes and spoken with the agents who were surveilling the parking lot of the meeting and believe that Cisneros was engaging in counter-surveillance during the meeting.  Specifically, agents noticed a silver colored Chevrolet Traverse

with no license plates drive around the entire parking lot, and then exit the parking lot without stopping several minutes prior to the arrival of the CHS and Cisneros.  Cisneros arrived at the location after the CHS, drove around the parking lot, and parked on the south side of the parking lot near a surveillance vehicle.  Cisneros departed the parking lot minutes later without exiting the vehicle.  Approximately two (2) minutes later, Cisneros returned to the parking lot, drove around the lot, and parked on the west side of the lot.  Cisneros sat in his vehicle for several minutes and then drove from his spot on the west side of the parking lot and parked several spots away from the CHS on the southwest portion of the parking lot.  Approximately twenty minutes after Cisneros had entered the restaurant to meet with the CHS, the silver colored Chevrolet Traverse with no license plates that was previously observed, again drove around the parking lot and departed without stopping.

45.    I have reviewed the translated transcription from the August 30, 2016 meeting with the CHS, and concluded that there were noted differences in Cisneros' statements during this meeting and the May 12, 2016 meeting.  Cisneros appeared to be cognizant of the fact that the CHS may have been recording their conversation.  Cisneros makes several false exculpatory statements during the meeting, and denies knowledge of violating the law in assisting the CHS to enter the United States in the past.  Cisneros states "the guy was even like, are you sure?  Have you seen this guy's record?  And I didn't.  I never saw it, you know?"  I understand this statement to be an attempt by Cisneros to deny having knowledge of the CHS's criminal history at the time he assisted the CHS in entering the United States.  During this meeting, Cisneros also denied having knowledge of the CHS's immigration hold, the CHS's past border crossing, and other factors surrounding the assistance Cisneros provided the CHS.

46.    According to CW1, BROUMAND and Cisneros were present at the Grand Havana Room in Beverly Hills for a party celebrating CW1 passing the California State Bar Exam in May 2016.  Cisneros drank excessively at the party, and caused a scene with some of the other guests.  CW1 told me that CW1 never asked BROUMAND to look up Cisneros in a FBI database.  However, CW1 admitted having numerous conversations with BROUMAND

regarding their concerns with Cisneros' behavior.  After the party, CW1 told BROUMAND that CW1 did not trust Cisneros, and that CW1 felt that Cisneros was "playing both sides" between CW1 and Termendzhyan.  CW1 informed me that at some point after the party in May 2016, BROUMAND warned CW1, by telling CW1 to "stay away from him [Cisneros], because he will get in trouble."  CW1 understood this to mean that Cisneros was under investigation.  According to CW1, CW1 did not tell Cisneros that BROUMAND had warned CW1 that Cisneros was under investigation.

<u>BROUMAND Receives Regular Cash Bribe Payments</u>

47.     According to CW1, CW1 and BROUMAND agreed that CW1 would pay BROUMAND $10,000 per month for information and BROUMAND's assistance in avoiding detection by law enforcement.  CW1 told me that CW1 would usually pay BROUMAND in cash, $100 bills, typically $5,000 or $10,000 per time.  CW1 also gave BROUMAND one (1) or two (2) $30,000 checks, in lieu of the cash bribe payments.  According to CW1, the regular cash payments to BROUMAND began in early 2015, slowed down after the placard incident in February 2016, and completely ceased after the May 2016 party at the Grand Havana Room.  According to CW1, BROUMAND told CW1 that they needed to "stop this" because BROUMAND was in trouble with the FBI.

48.     As a result of my conversations with CW1, I understand that CW1 only made bribe payments to BROUMAND when CW1 was physically present with BROUMAND.  As such, there was not a regular frequency with which the bribe payments occurred.  CW1 believed that BROUMAND traveled to Los Angeles approximately twenty-five (25) times over the duration of their corrupt relationship.  According to CW1, BROUMAND would have received a bribe payment from CW1 on approximately twenty (20) of those trips.  CW1 did not know what BROUMAND did with the cash bribe payments.  CW1 knew that BROUMAND used some of the money to purchase a home in Lake Tahoe, California, and that BROUMAND frequented a jewelry store in Beverly Hills.

<u>Analysis of Cash Deposits into BROUMAND's Bank Accounts</u>

49.     A review of BROUMAND's bank records, indicate that BROUMAND was depositing portions of the cash bribe payments from CW1 into bank accounts under the control of BROUMAND and his wife.  Cash deposits made to Love Bugs accounts, controlled by BROUMAND and his wife, were indicative of the cash bribe payments from CW1 during 2015 and 2016.  The pattern of cash deposits during these years differed from that of prior and subsequent periods.  The cash deposits were whole dollar amounts, were much larger than in prior years, and did not occur with any regular frequency as would be expected with a typical service-oriented small business.  Further, according to interviews of Love Bugs employees conducted by agents involved in this investigation, the business did not typically receive cash payments, and when they did receive cash it was normally converted to petty cash and used to purchase supplies by the employees.

50.     During 2015, there were five (5) cash deposits totaling $36,000 made to JPMorgan Chase account number ending 8236 for Love Bugs, LLC ("Chase 8236").  Four (4) of the deposits were made at the JPMorgan Chase Market and 8th Branch located at 1201 Market Street, San Francisco, California.  BROUMAND worked at the FBI office at 450 Golden Gate Avenue, San Francisco, California, which is approximately four (4) city blocks away from this branch.  Of the five (5) cash deposits, three (3) deposits totaling $25,000 were made during the four (4) days between September 21, 2015 and September 25, 2015.  These cash deposits appear to be structured to avoid bank reporting requirements.  Also during 2015, there was one (1) cash deposit on April 27, 2015 in the amount of $14,000 made to Wells Fargo account number ending 8017 for BROUMAND and his wife dba Lovebugs ("Wells Fargo 8017").  A report filed by Wells Fargo Bank, noted that BROUMAND deposited the $14,000 on behalf of his wife, whose

occupation was listed as "hair stylist."[13]  A table summarizing the cash deposits made during 2015 is below:

| Date | Amount | Bank | Account # | Account Name | Branch |
|---|---|---|---|---|---|
| 02/17/2015 | $5,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th 1201 Market St. San Francisco, CA |
| 04/27/2015 | $14,000.00 | Wells Fargo | x8017 | BROUMAND and Wife dba Lovebugs | 3630 Mt. Diablo Blvd. Lafayette, CA |
| 05/12/2015 | $6,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Mt. Diablo Blvd. 3492 Mt. Diablo Blvd. Lafayette, CA |
| 09/21/2015 | $8,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th 1201 Market St. San Francisco, CA |
| 09/24/2015 | $8,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th 1201 Market St. San Francisco, CA |
| 09/25/2015 | $9,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th 1201 Market St. San Francisco, CA |
| **TOTAL** | **$50,000.00** | | | | |

51.     During 2016, there were six (6) cash deposits totaling $32,500 made to Chase 8236.  Three (3) of the deposits were made at the JPMorgan Chase Market and 8th Branch located at 1201 Market Street, San Francisco, California.  There were no cash deposits made to the Love Bugs accounts during the second half of 2016, which corresponds with what CW1 told me about the regular cash bribe payments to BROUMAND ceasing after May 2016.

52.     Also during 2016, there was one (1) cash deposit on November 7, 2016 in the amount of $7,200 made to JPMorgan Chase account number ending 0198 for BROUMAND and his wife ("Chase 0198").  A table summarizing the cash deposits made during 2016 is below:

| Date | Amount | Bank | Account # | Account Name | Branch |
|---|---|---|---|---|---|
| 01/28/2016 | $5,500.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th 1201 Market St. San Francisco, CA |

---

[13] According to home loan applications filled out by BROUMAND and his wife in 2015 and 2016, she has been employed full time as an attorney at a Real Estate Disclosure company since approximately 1999.  BROUMAND's wife has been a member of the California State Bar since 1997.

| 02/29/2016 | $8,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th<br>1201 Market St.<br>San Francisco, CA |
| 03/08/2016 | $5,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Walnut Creek Geary<br>1510 Palos Verdes<br>Walnut Creek, CA |
| 03/17/2016 | $4,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Van Ness & McAllister<br>500 Van Ness Ave.<br>San Francisco, CA |
| 04/18/2016 | $5,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Walnut Creek Geary<br>1510 Palos Verdes<br>Walnut Creek, CA |
| 06/03/2016 | $5,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC | Market and 8th<br>1201 Market St.<br>San Francisco, CA |
| 11/07/2016 | $7,200.00 | JPMorgan Chase | x0198 | BROUMAND<br>or Wife | Mt. Diablo Blvd.<br>3492 Mt. Diablo Blvd.<br>Lafayette, CA |
| **TOTAL** | **$39,700.00** | | | | |

53.     During the three (3) years prior to 2015, there were only five (5) cash deposits totaling $7,705.11 to Love Bugs accounts.  A table summarizing the cash deposits during 2012 through 2014 is below:

| Date | Amount | Bank | Account # | Account Name |
|---|---|---|---|---|
| 02/03/2012 | $1,600.00 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 08/02/2012 | $3,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 05/06/2013 | $87.11 | Wells Fargo | x8017 | BROUMAND and Wife<br>dba Lovebugs |
| 07/25/2013 | $18.00 | Wells Fargo | x8017 | BROUMAND and Wife<br>dba Lovebugs |
| 02/19/2014 | $3,000.00 | JPMorgan Chase | x7373 | Love Bugs, LLC |
| **TOTAL** | **$7,705.11** | | | |

54.     Beginning in 2017, the pattern of cash deposits made to Love Bugs accounts changed in at least two ways.  First, the amounts of the cash deposits decreased significantly.  Of the nine (9) cash deposits totaling $18,940.58 made in 2017 and 2018, only one (1) deposit was over $2,000.  Second, most of the cash deposits made in 2017 and 2018 included cents.  Although three (3) deposits were whole-dollar amounts, the $2,000 deposit on August 7, 2017 and the $1,000 deposit on July 20, 2018 may be indicative of monies CW1 was returning to

23

BROUMAND as detailed below in paragraphs 78 to 80.  A table summarizing the cash deposits made during 2017 and 2018 is below:

| Date | Amount | Bank | Account # | Account Name |
|------|--------|------|-----------|--------------|
| 08/07/2017 | $2,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 03/12/2018 | $1,725.32 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 03/12/2018 | $1,115.16 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 03/20/2018 | $856.32 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 04/02/2018 | $813.80 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 04/10/2018 | $799.68 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 04/12/2018 | $630.30 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 04/27/2018 | $10,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| 07/20/2018 | $1,000.00 | JPMorgan Chase | x8236 | Love Bugs, LLC |
| **TOTAL** | **$18,940.58** | | | |

55.    Based upon my training and experience, I believe the cash deposited to the Love Bugs accounts during 2015 and the first half of 2016, are portions of the cash bribe payments BROUMAND received from CW1.  Further, several of these cash deposits were structured by BROUMAND to avoid reporting requirements.  It should be noted that the structured cash deposits were during the time period in which BROUMAND was buying his second home in Lake Tahoe and needed money for the down payment.

BROUMAND Receives $30,000 Checks from CW1 in Violation of 18 U.S.C. § 371 (Conspiracy to Commit Bribery of Public Official) and Commits At Least One Overt Act

56.    CW1 told me that BROUMAND received one (1) or two (2) $30,000 checks from CW1, in lieu of the regular cash bribe payments.  CW1 never wrote a check directly from CW1 to BROUMAND, because, in order to conceal the source and reason for the payments, BROUMAND did not want to receive a check directly from CW1.

57.    The first $30,000 check from CW1 occurred in September 2015 when BROUMAND wanted to purchase a home in the Lake Tahoe area.  According to CW1, CW1 owed BROUMAND two (2) or three (3) months of bribe payments, in exchange for BROUMAND searching names in law enforcement databases and providing CW1 protection, by assisting CW1 in CW1's efforts to evade detection by law enforcement.  BROUMAND did not

want to physically possess $30,000 in cash, so BROUMAND requested that CW1 write a check for the bribe payments.

58.     Based upon a review of bank records by me and other agents assigned to this case, I know that on or about September 30, 2015, BROUMAND deposited a $30,000 cashier's check from Andor'e Inc., made payable to Love Bugs, into Chase 8236 at the JPMorgan Chase Beverly Hills Downtown Branch located at 9245 Wilshire Boulevard, Beverly Hills, California. According to publicly available information, Andor'e Inc. was a hair salon operating in Beverly Hills, California.  CW1 said that CW1 had loaned the owner of Andor'e Inc., GM, money needed to open the business.  Rather than repaying a portion of the loan to CW1, CW1 obtained a cashier's check from Andor'e Inc.'s account and made it payable to Love Bugs.  CW1 told me that it was BROUMAND's idea to make the check payable to Love Bugs.  CW1 told BROUMAND that the check to BROUMAND would be coming from a hair salon. BROUMAND told CW1 that was "even better" as it gave the appearance of being a business transaction since Love Bugs was also a hair salon-related business.

59.     Approximately five (5) days after the cashier's check was deposited to Chase 8236, on or about October 5, 2015, $30,000 was transferred to USAA Federal Savings Bank account number ending 1136 for BROUMAND and his wife ("USAA 1136").  On or about October 9, 2015, $35,000 was transferred from USAA 1136 to USAA Federal Savings Bank account number ending 1128 for BROUMAND and his wife ("USAA 1128").

60.     Based upon my analysis of bank and escrow records and public source information, I know that this money, along with other money totaling $355,355.06, was transferred to Placer Title Company as a down payment for the purchase of BROUMAND's Lake Tahoe property, an approximately $1.3 million home located at 3275 West Lake Boulevard, Homewood, California 96141 (the "Lake Tahoe Home").  The property is titled in the names of BROUMAND and his wife.

61.     After Burbank PD found the FBI parking placard in CW1's possession in February 2016, BROUMAND and CW1 misrepresented that this $30,000 bribe payment was

instead a loan, as detailed further in paragraphs 78 to 80 below.  Additionally, on or about September 12, 2017, CW1 was interviewed by law enforcement and falsely stated this check was a "loan" to BROUMAND.  CW1 has since admitted to me that his September 12, 2017 statement that the $30,000 was a loan was a lie.

62.     CW1 told me that CW1 gave another $30,000 check to BROUMAND for the purchase of the remaining inventory in a clothing store owned by BROUMAND's father.  Based on my review of public records, I know that BROUMAND's father, HB, owned and operated a clothing store in Lake Elsinore, California, called Piero Men's Boutique.  According to CW1, in approximately March 2016, BROUMAND asked CW1 if CW1 knew anyone that would be willing to purchase the remaining inventory in his father's store, which was closing.  CW1 told me that CW1 "needed to take care of BROUMAND," so CW1 offered to purchase the remaining inventory, which CW1 then donated to charity.

63.     Based upon my analysis of bank records, on or about March 21, 2016, a $30,000 check from ARCA Capital, Inc., made payable to ZA, BROUMAND's mother, was deposited in Bank of America account number ending 4983 for HB and ZA ("BOA 4983").  CW1 told me that this check was for the inventory of HB's store, and ARCA Capital, Inc. was a company under CW1's control.

64.     Approximately one (1) month after the check was deposited to BOA 4983, on or about April 21, 2016 a wire in the amount of $29,300 was sent from BOA 4983 to the Love Bugs' JPMorgan Chase account, Chase 8236.  Approximately four (4) days later on April 25, 2016, a $25,906.85 payment was made from Chase 8236 to the Love Bugs' American Express account number ending 1001, an account that was used extensively for personal expenses as detailed in footnote 7.

Cash Deposits to HB and ZA's Bank Account

65.     In addition to the check from CW1 that was deposited into BOA 4983 for BROUMAND's parents, HB and ZA, between 2015 and 2017 there were $25,000 of cash deposits into BOA 4983, some of which may be indicative of cash bribe proceeds received by

BROUMAND from CW1.  Three deposits totaling $13,000 were made to BOA 4983 after the Piero Men's Boutique closed in early 2016, and all three deposits were made at BOA branches near BROUMAND's Primary Residence.  A table summarizing the cash deposits between 2015 and 2017 is below:

| Date | Amount | Bank | Account # | Account Name | Branch |
|------|--------|------|-----------|--------------|--------|
| 05/01/2015 | $1,400.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 05/11/2015 | $1,000.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 12/16/2015 | $4,000.00 | Bank of America | X4983 | HB and ZA | Brooklyn |
| 02/17/2016 | $2,400.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 02/17/2016 | $1,000.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 02/22/2016 | $1,200.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 02/29/2016 | $1,000.00 | Bank of America | X4983 | HB and ZA | Lake Elsinore |
| 08/26/2016 | $3,000.00 | Bank of America | X4983 | HB and ZA | Lafayette |
| 08/24/2017 | $5,000.00 | Bank of America | X4983 | HB and ZA | Martinez |
| 08/28/2017 | $5,000.00 | Bank of America | X4983 | HB and ZA | Martinez |
| **TOTAL** | **$25,000.00** | | | | |

### Additional Items of Value CW1 Provided to BROUMAND

66.     In addition to the Ducati motorcycle that CW1 purchased as a bribe payment for BROUMAND in exchange for information on QRFM, as detailed above in paragraphs 24 to 26, BROUMAND received numerous items of value from CW1.  According to CW1, CW1 paid for everything when BROUMAND would come to Los Angeles, to include luxury hotels, transportation, meals, drinks, and cigars.  CW1 also flew BROUMAND to Las Vegas, Nevada on CW1's private jet.  CW1 recalled travelling to Las Vegas with BROUMAND on multiple occasions.  CW1 told me that CW1 would typically pay for all expenses while in Las Vegas, to include hotels, meals, and drinks.

67.     As a result of my conversations with CW1, I understand that CW1 also purchased the services of a female escort, NK, for BROUMAND on several occasions.  According to CW1, on one occasion when BROUMAND was visiting CW1 in Los Angeles, CW1 asked BROUMAND if he would be interested in the services of an escort, an offer that BROUMAND accepted.  CW1 told me that BROUMAND took a "liking" to NK, so CW1 made a point of hiring NK, whenever BROUMAND was in town.  CW1 recalled paying NK between $500 and

$1,500 cash per time for her services, and CW1 told me that BROUMAND witnessed CW1 paying NK on one occasion.

BROUMAND Proposes Utilizing FBI Sources for Financial Gain

68.     CW1 told me that BROUMAND proposed to CW1 that they start an Intelligence business together, J&J Intelligence Services, with a friend of BROUMAND's who was retiring from the Central Intelligence Agency ("CIA").  BROUMAND told CW1 that he had several foreign sources that he had developed through his employment with the FBI, and that various Agencies in the United States Government ("USG") would purchase the information that these sources had.  According to CW1, BROUMAND's plan for the business was to purchase this information directly from these foreign sources and sell the information to the USG for a profit.

69.     According to CW1, BROUMAND told CW1 that the company would have to go through a certification process and that the executives of the company would need to have Top-Secret security clearances.  BROUMAND suggested that his friend retiring from the CIA would be the Chief Executive Officer, and BROUMAND would provide the company information to sell to the USG until BROUMAND retired from the FBI, at which point he would also become an executive of the company.  CW1 told me that BROUMAND wanted CW1 to fund the business, and to be the main shareholder of the company.

70.     Based on my conversations with CW1 and my review of CW1's text messages with BROUMAND, I learned that BROUMAND initially asked CW1 for $30,000 to purchase information from a foreign source.  BROUMAND told CW1 the information would be very valuable.  CW1 told me that CW1 was hesitant to provide the money because the company had not been set up.  In addition, CW1 was going through financial hardship at the time BROUMAND asked, and ultimately did not fund the company.  CW1 told me that BROUMAND liked money, and in CW1's opinion, this business was a way for BROUMAND to monetize the information and connections BROUMAND had made through his employment with the FBI.

BROUMAND Proposes Using CW1 to Launder Gaddafi Money

71.     According to CW1, in 2017, BROUMAND informed CW1 that he had a FBI
source who was working with a Libyan General who had taken large sums of cash,
approximately $1 or $2 billion, from Libya.  BROUMAND told CW1 that the cash had been
taken somewhere else in Africa, and that the FBI source was trying to "wash" the money through
the United States.  According to CW1, BROUMAND told CW1 that he was working on
obtaining FBI approval, but wanted to use CW1's private jet to launder the money in the United
States.  BROUMAND stated that nobody was going to count that much money, so
BROUMAND and CW1 would be able to siphon away some of the money for their personal
benefit.

72.     According to CW1, several weeks to a month after the initial discussion, CW1
asked BROUMAND about the status of the operation.  BROUMAND told CW1 that the FBI had
deemed the operation was too great a risk and was not going to move forward with it.  Based on
my conversations with CW1, I learned that BROUMAND told CW1 that he believed they could
still pull off the operation without the FBI.  BROUMAND told CW1 that they would still need to
use CW1's private jet to fly in and pick up the money, and that they would need some armed
security.  However, according to CW1, BROUMAND eventually told CW1 to "forget about it,"
and that it was "too dangerous."  Given BROUMAND's position in the FBI and CW1's history
with BROUMAND, CW1 told me that CW1 believed the information BROUMAND was
providing to be credible.

73.     Based on my review of FBI source reporting, I know that beginning in late 2016
and continuing through 2017, a FBI source was reporting to BROUMAND information
regarding $2.5 billion that was smuggled out of Libya at the direction of Muammar al-Gaddafi
("Gaddafi") prior to the Arab Spring.  The FBI source provided details to BROUMAND
regarding the alleged location of the money.  Based on my review of an audit of the FBI's case
management database, on or about October 4, 2016, BROUMAND queried "Gaddafi money" in
the FBI database.  BROUMAND's query returned additional information that it appears

BROUMAND told CW1 in devising a scheme to personally profit from the FBI source's information regarding the Gaddafi money.

<u>BROUMAND Offers to Remove Individuals from the Terrorist Watchlist</u>

74.     According to CW1, BROUMAND told CW1 that he had the ability to remove Iranians from the terrorist watchlist.  CW1 told me that CW1 understood this be an offer from BROUMAND, to remove someone from the terrorist watchlist at the direction of CW1 in exchange for a bribe payment.  According to CW1, CW1 never asked BROUMAND to remove anyone from the terrorist watchlist.

**C.     False Statements by BROUMAND**

<u>False Statements on SFDF</u>

75.     Pursuant to Executive Order 12968, the FBI has established a Financial Disclosure Program whereby personnel with access to particularly sensitive classified information are required to complete and submit an annual Security Financial Disclosure Form ("SFDF").  Because of his position as a FBI Special Agent with access to sensitive compartmented information, BROUMAND was required to complete and submit a SFDF annually.  The SFDF form contains a certification, signed by BROUMAND that the answers are "true, complete and accurate" and an acknowledgement by him that false answers are subject to punishment under 18 U.S.C. § 1001 (False Statements).

76.     I have obtained and reviewed BROUMAND's SFDF forms, and learned that BROUMAND failed to disclose, and/or misrepresented the bribe payments he received from CW1 on his 2015, 2016, and 2017 SFDF.  BROUMAND submitted his 2015 SFDF on or about April 25, 2016; his 2016 SFDF on or about March 24, 2017; and his 2017 SFDF on or about April 27, 2018.

77.     The SFDF requires the filer to disclose all sources of income for the year, and to describe their cash income if it exceeds $10,000 for the year.  Based on my review of his SFDF, BROUMAND failed to disclose on his 2015 and 2016 SFDF any of the bribe payments he received from CW1, cash or checks, as detailed above in paragraphs 47 to 64.  BROUMAND

also failed to disclose as income on his 2015 SFDF the Ducati Panigale that CW1 purchased for BROUMAND as a "bonus" for information BROUMAND had provided regarding QRFM, detailed above in paragraphs 24 to 26.

78.     According to CW1, after BROUMAND's FBI parking placard was seized by Burbank PD, BROUMAND told CW1 that he needed to make the bribe payment from CW1, in the form of a $30,000 check from Andor'e Salon to Love Bugs, detailed in paragraph 57 to 61 above, appear to be a loan from CW1.  BROUMAND told CW1 that he would need to write several checks to CW1, as "repayment" of the loan.  CW1 told me that CW1 and BROUMAND agreed that if they were ever questioned by law enforcement, they would say that the $30,000 check was a loan, and that BROUMAND was making payments on it.  As such, after becoming aware of the presence of a DOJ OIG investigation, refer to footnote 8, BROUMAND misrepresented on his 2017 SFDF, filed in April 2018, that the $30,000 bribe payment from CW1 was a loan.  After reviewing BROUMAND's SFDF, I know that BROUMAND listed on his 2017 SFDF that the loan from CW1 was for $30,000, that BROUMAND had repaid $3,000 on the loan, and that the remaining balance was $27,000.  Whether it was a loan or a bribe, the $30,000 payment from CW1 was reported over a year late and only after BROUMAND knew DOJ OIG was investigating him.

79.     An analysis of BROUMAND's bank records shows that BROUMAND made two (2) $1,000 payments to CW1 in December 2016, and one (1) $1,000 payment to CW1 in April 2018.  On or about December 13, 2016, check number 4783 drawn on USAA 1136, made payable to CW1 from BROUMAND, cleared.  The check was dated December 3, 2016 and had "$29,000" written in the memo line.  On or about December 27, 2016, check number 4704 drawn on USAA 1136, made payable to CW1 from BROUMAND, cleared.  The check was dated December 19, 2016 and had "$28,000" written in the memo line.  On or about May 21, 2018, check number 4904 drawn on USAA 1136, made payable to CW1 from BROUMAND, cleared. The check was dated April 30, 2018 and had "$27,000" written in the memo line.

80.     According to CW1, when CW1 received the $1,000 checks from BROUMAND, CW1 cashed the checks.  CW1 then gave the cash back to BROUMAND the next time CW1 saw BROUMAND.  A review of BROUMAND's bank records show that on August 7, 2017, $2,000 cash was deposited into Chase 8236, and on July 20, 2018, $1,000 cash was deposited into Chase 8236.

False Statements to FBI Special Agent Kusin

81.     BROUMAND consistently misrepresented the nature of his relationship with CW1 to other FBI Special Agents and to his supervisor, in order to conceal the true nature of his corrupt relationship with CW1.  According to CW1, BROUMAND and CW1 had multiple conversations about making CW1 a FBI source.  BROUMAND's intent in doing so was to provide protection and cover for their corrupt relationship.  CW1 told me that CW1 had no intent of being an actual FBI source or of providing useful information to the FBI, and BROUMAND was aware of this.

82.     BROUMAND made multiple false statements to FBI SA Kusin, as detailed in paragraphs 18 to 22 above.  In January 2015, BROUMAND told SA Kusin that he had a potential source that could assist in the Termendzhyan investigation, and wrote in his travel request that he was "assist[ing] LA division with source recruitment."  However, BROUMAND had no intention of introducing SA Kusin to CW1, and advised CW1 not to meet with the FBI.

83.     In March 2017, CW1 told BROUMAND that he wanted to meet with the FBI and provide information on Termendzhyan.  CW1 wanted to begin cooperating with the government, in hopes of limiting his exposure from his involvement in criminal activity.  CW1 believed that CW1 had attracted the attention of law enforcement because BROUMAND informed CW1 that Termendzhyan was under investigation, CW1's co-conspirator in a credit card fraud scheme was arrested, and Cisneros was questioned by the FBI regarding his association with Termendzhyan and Balian.  According to CW1, BROUMAND was reluctant to arrange a meeting, and advised CW1 against meeting with the FBI.

84.     On or about March 21, 2017, the day before Cisneros was arrested on federal charges, BROUMAND emailed SA Kusin, and asked him "If you remember a couple years back I tried to introduce you to [CW1].  [CW1] told me that [CW1] contacted you today, and being that you didn't remember [CW1], you requested I reach out to you to jog your memory."  SA Kusin told me that BROUMAND's email was not accurate, and that BROUMAND had never introduced SA Kusin to CW1.  SA Kusin had never met CW1, and the only way CW1 would have had his number was if BROUMAND had given it to CW1.


False Statements to FBI Supervisory Special Agent Kelly

85.     FBI SSA Kelly, BROUMAND's supervisor, believed that BROUMAND may have been assisting SA Kusin and SA Adib recruit FBI sources in Los Angeles, and that BROUMAND was utilizing his relationship with HM to develop potential FBI sources in Los Angeles.  BROUMAND appears to have concealed and misrepresented to SA Kelly the true nature of his relationship with CW1, and the reasons for his travel to Los Angeles.

86.     After the January 2015 trip to Los Angeles, BROUMAND had no documented official FBI travel to Los Angeles.  Further, BROUMAND had no continued contact with SA Kusin after January 2015, and was not assisting SA Kusin to recruit FBI sources.  SA Adib told me that he had not worked with BROUMAND since 2012, and that BROUMAND was not assisting him in recruiting sources.  According to SA Adib, in 2012 BROUMAND was instructed by FBI management to stop operating in Los Angeles, after it was discovered that BROUMAND was operating outside of his territory, without proper approval, and was coaching sources on what to say to FBI management and other agencies, in hopes that it would allow BROUMAND to continue operating the Los Angeles based sources.

False Statements to FBI Special Agent Adkins

87.     BROUMAND also made multiple false statements to FBI SA Adkins, as detailed in paragraphs 35 to 46 above.  BROUMAND falsely told SA Adkins that CW1 had attempted to broker a meeting between he and Termendzhyan, when BROUMAND had actually met Termendzhyan a year prior.  BROUMAND wrote in the FD-1057 he serialized to SA Adkins'

case file, which I have obtained and reviewed, that BROUMAND had only met Cisneros one other time, when in fact BROUMAND spent a significant amount of time with Cisneros over the duration of his corrupt relationship with CW1, and had travelled to Las Vegas with Cisneros on CW1's private jet.  In addition, BROUMAND wrote in the FD-1057 that Cisneros arrived to and left the party with an "unknown police officer from Glendale police department."   As a result of my conversations with CW1, I know that the Glendale police officer was Balian, who BROUMAND also had spent a significant amount of time with over the duration of his corrupt relationship with CW1.  I believe that BROUMAND withheld the identity of Balian, because BROUMAND knew that SA Adkins was suspicious of his justification for having looked up "Cisneros" in the FBI case management database and was attempting to protect Balian from law enforcement scrutiny.

### False Statements on a Union Bank Loan

88.     On or about November 10, 2016, BROUMAND purchased his primary residence, located at 1450 Rancho View Drive, Lafayette, CA 94549 (the "Primary Residence") for approximately $1.7 million.  BROUMAND obtained an approximately $1.3 million loan from MUFG Union Bank ("Union Bank") in purchasing the Primary Residence.  Equitable Mortgage Group ("EMG") brokered the loan between BROUMAND and Union Bank.  BROUMAND signed a Uniform Residential Loan Application for the loan from Union Bank on November 2, 2016 that contained multiple false statements.

89.     According to EMG Loan Officer CC, BROUMAND had a debt-to-equity ratio of 42.997% at the time he applied for this loan.  CC told me that the highest allowable debt-to-equity ratio BROUMAND could have, and still qualify for the Union Bank loan, was 43%. BROUMAND included on the loan application that he was renting the Lake Tahoe Home for $5,500 per month.  CC told me that without this rental income from the Lake Tahoe Home, BROUMAND would not have qualified for the Union Bank loan.

90.     As support for the loan application, BROUMAND provided EMG a lease agreement for the Lake Tahoe Home dated July 31, 2016, that was signed by BROUMAND as

34

the landlord, and MW and TW as the tenants. The agreement stated that MW and TW would rent the property from August 1, 2016 until July 31, 2017 for $5,500 per month, with a security deposit of $2,000 due with the first month of rent. Also included as support, was a copy of a check number 797 from MW and TW, dated July 31, 2016, made payable to BROUMAND for $7,500. On or about August 31, 2016, the Union Bank underwriter, LM, requested additional support for the rental income from the Lake Tahoe Home. In response, BROUMAND provided EMG an email dated August 31, 2016 from MW, which explained why MW and TW entered into a lease agreement with BROUMAND for the Lake Tahoe Home. BROUMAND also provided a copy of an additional check, number 822, from MW and TW dated September 1, 2016. The $5,500 check was made payable to BROUMAND's wife and had "Tahoe Rent" written in the memo line.

91.     A review of BROUMAND's bank records, show that checks 797 and 822 from MW and TW were deposited into USAA 1136 on or about August 15, 2016 and September 1, 2016, respectively. Additionally, check number 850 from MW and TW for $5,500, dated September 26, 2016, and made payable to BROUMAND's wife, was deposited in USAA 1136 on or about October 7, 2016. No additional checks from MW and TW for lease of the Lake Tahoe Home were deposited in BROUMAND's bank accounts after the purchase of the Primary Residence.

92.     According to MW and TW, who are related to BROUMAND's wife, they did not rent the Lake Tahoe home, as stated in the lease agreement, and had never intended to pay rent pursuant to the lease agreement for the entire term of the lease. Although MW and TW would stay at the Lake Tahoe home as guests, they entered into the lease agreement and provided the checks, which were for the stated purpose of "Tahoe Rent," to BROUMAND and his wife for the sole purpose of allowing BROUMAND and his wife show additional income when applying for the Union Bank loan to purchase their Primary Residence. Additionally, MW and TW believed that BROUMAND and his wife had reimbursed them in cash for some of these "Tahoe Rent" payments. I believe that BROUMAND and his wife, with the assistance of MW and TW,

fabricated the lease agreement and rent payments in order to qualify for the Union Bank loan for which they otherwise would not have qualified.

93.     According to CC, BROUMAND should have disclosed any portion of the down payment for the Primary Residence that included a loan or gift from a third party.  Additionally, BROUMAND would have been required to fill out a gift letter for the monies he received.  BROUMAND failed to disclose that $33,000 of the down payment originated from BOA 4983, an account in the name of BROUMAND's parents.  On or about August 17, 2016, check number 5236, drawn on BOA 4983 cleared.  The check was in the amount of $33,000 and was payable to Lawyer's Title.  The memo was "deposit for 1450 Rancho View."

<u>False Statements on an Equitable Mortgage Group Loan</u>

94.     On or about November 3, 2015, BROUMAND purchased the second residence in the Lake Tahoe, California area, located at 3275 West Lake Boulevard, Homewood, California 96141 (the "Lake Tahoe Home") for approximately $1.3 million.  BROUMAND obtained an approximately $875,000 loan from American Pacific Mortgage ("APM") in purchasing the Lake Tahoe Home, which appeared to be a vacation home.  EMG is a subsidiary of APM, and qualified BROUMAND for the loan.  BROUMAND signed a Uniform Residential Loan Application for the loan from EGM on September 15, 2015 that contained multiple false statements.  CC told me that EMG sells almost all their large loans within 30 days of initially funding the loan, and EMG had sold the loan for the Lake Tahoe Home to JPMorgan Chase Bank.

95.     CC told me that BROUMAND had a debt-to-income ratio of 39% at the time he qualified for this loan.  CC told me that the minimum industry standard debt-to-income ratio for this type of "Jumbo Loan" was 43%.  BROUMAND initially wanted to purchase the Lake Tahoe Home as a vacation property, but then decided to classify the property as an investment property.  BROUMAND included on the loan application that he would be renting the Lake Tahoe Home for $6,550 per month.  CC told me that without this rental income from the Lake Tahoe Home, BROUMAND would not have qualified for the loan.

36

96.     As support for the loan application, BROUMAND provided EMG a lease agreement for the Lake Tahoe Home dated October 19, 2015, that was signed by BROUMAND or his wife as the landlords, and MW and TW as the tenants.  The agreement stated that MW and TW would rent the property from November 1, 2015 until November 1, 2016 for $6,550 per month, with a security deposit of $1,000 due with the first month of rent.  BROUMAND did not include any checks from MW and TW as proof of rental income for the property.  A review of BROUMAND's bank records failed to locate any checks from MW and TW for this lease of the Lake Tahoe Home.

97.     According to MW and TW, they did not rent the Lake Tahoe home at that time.  Further, MW and TW were not aware of the existence of this lease agreement, and stated that those were not their signatures on the lease agreement.  I believe that BROUMAND and his wife fabricated the lease agreement and forged MW and TW's signatures on the agreement in order to qualify for the EMG loan for which they otherwise would not have qualified.

98.     CC told me that BROUMAND should have also disclosed any portion of the down payment for the Lake Tahoe Home that included a loan or gift from a third party.  Any money that was from an unsecured loan would not have been allowed to be included in BROUMAND's cash reserves.  Any money that was a gift would have needed to be disclosed, and a gift letter would have needed to be included.  CC told me that EMG investigates the sources of all deposits in a borrower's bank account that exceed 25% of their monthly income for at least the previous two (2) to three (3) months, in order to ensure that the money for the cash reserve was not borrowed.

99.     BROUMAND failed to disclose that $30,000 of the down payment for the Lake Tahoe Home originated from CW1, as detailed above in paragraphs 57 to 61.  Further, BROUMAND falsified records that he submitted to EMG, in order to conceal the true source and nature of the $30,000 check from Andor'e Salon.  EMG required BROUMAND to provide support for the $35,000 wire transfer into USAA 1128 on October 9, 2015.  $30,000 of this wire

37

transfer originated as a bribe payment from CW1, in the form of a cashier's check from Andor'e Salon, which BROUMAND deposited into Chase 8236.

100.    In explaining the $35,000 wire transfer, BROUMAND provided EMG a letter stating that he had sold his boat, and that the purchaser "used a check drawn from his business account." BROUMAND went on to say that he requested the check be made payable to Love Bugs because he wanted to deposit the check immediately and could not deposit the check in his personal USAA account since the bank was located in Texas. BROUMAND also provided EMG a copy of the Andor'e Salon cashier's check, and a Bill of Sale for the Boat, a 1991 Sea Ray. The Bill of Sale, dated September 30, 2015, listed CW1 as the purchaser of the boat.

101.    CW1 told me that CW1 never purchased a boat from BROUMAND. After reviewing the Bill of Sale, CW1 confirmed that CW1 did not buy BROUMAND's boat and did not recall ever signing the Bill of Sale. I believe that BROUMAND falsified the Bill of Sale that he submitted to EMG, in order to conceal the bribe payment from CW1. Based upon my investigation, I have determined BROUMAND actually sold the boat to someone else via Craigslist on or about December 15, 2015 for approximately $6,000 in cash.

### D.    BROUMAND Underreports His Taxable Income

102.    Based upon my review of the relevant records, and discussions with IRS-CI Special Agent Mark Silva, I believe that BROUMAND underreported his taxable income for the 2013, 2014, 2015, 2016, and 2017 tax years.

103.    BROUMAND failed to report over $48,000 in gross receipts on Love Bugs' partnership income tax return (Form 1065) for the tax years 2013, 2015, 2016, and 2017. This calculation of unreported income is completely unrelated to the bribery scheme. Love Bugs used merchant accounts to process credit card transactions at its two (2) business locations. The proceeds from these merchant account transactions were deposited into a JPMorgan Chase Bank account for Love Bugs. BROUMAND received Forms 1099-K, Payment Card and Third Party Network Transactions, from the merchant processors that showed the total amounts received. BROUMAND reported as gross receipts on Love Bugs' Form 1065 the amounts listed on the

38

Forms 1099-K for the credit card and third party transactions.  However, BROUMAND failed to report the cash and checks that Love Bugs received from customers.  BROUMAND deposited the majority of these checks into separate Wells Fargo Bank accounts for Love Bugs.

104.    BROUMAND also failed to report over $113,000 in partnership income received from Love Bugs for the tax years 2013, 2014, 2015, and 2016.  BROUMAND filed a personal income tax return (Form 1040/1040X) for these tax years with a filing status of "married filing jointly."  BROUMAND and his wife are equal partners in Love Bugs, and together own 100% of the business.  However, BROUMAND only reported 50% of the ordinary business income from Love Bugs' Form 1065 on his Form 1040/1040X for these tax years, despite BROUMAND and his wife owning 100% of the business.  Further, for the 2017 tax year, BROUMAND reported a loss on Love Bugs' Form 1065, and included 100% of the ordinary business loss on his Form 1040.

105.    In the 2015 tax year, BROUMAND also failed to report approximately $200,000 in capital gains from the sale of two (2) condominium properties in Corpus Christi, Texas and one (1) property in Tahoma, California.  The proceeds from the sale of these properties were deposited into BROUMAND's bank account and were subsequently used to purchase the Lake Tahoe Home.

106.    In the 2015 and 2016 tax years, BROUMAND also failed to report as taxable income the bribe payments and Ducati that he received from CW1.

## V.    NECESSITY FOR CELL-SITE AND GPS ORDER

107.    Locating BROUMAND in order to safely effect an arrest is a difficult endeavor for a variety of reasons, which include the location of the Primary Residence, BROUMAND's familiarity with FBI tactics, BROUMAND's access to weapons, and the novel coronavirus pandemic.

108.    BROUMAND was an FBI Special Agent for twenty (20) years.  As such, BROUMAND is extensively aware of the FBI's training and tactics.  BROUMAND is aware of

the FBI's surveillance techniques, and was trained to look for and identify possible surveillance. BROUMAND is also familiar with the FBI's tactics and procedures for effecting arrests.

109.    Rancho View Drive in Lafayette, California, is a narrow, hilly, dead-end residential road, which I have personally been to and observed.  Rancho View Drive intersects with Pleasant Hill Road, which is a main four (4) lane thru way, with no area to discretely park on the side of the road.   The location of BROUMAND's Primary Residence on Rancho View Drive, which is contained on a lot on top of a hillside that slopes down in the back, along with the other factors, makes it difficult to conduct surveillance to identify individuals coming in and out of the Primary Residence.  Any attempt to place a surveillance vehicle on either Rancho View Drive or Pleasant Hill Road would immediately be identified by BROUMAND, as there is no location to safely and discretely park on either road.

110.    On March 19, 2020, in response to the novel coronavirus pandemic, the state of California issued a stay at home order.  The order states that until further notice, everyone in California is required to stay at home except to get food, care for a relative or friend, get necessary health care, or go to an essential job.  This order remains in effect with no end date currently set.  It is possible that BROUMAND may not leave the Primary Residence for several days, making it even more difficult to ascertain BROUMAND's location in order to safely effect the arrest.  Additionally, BROUMAND could be sheltering in place at the Lake Tahoe Home.

111.    During the execution of a search warrant by myself and other special agents of IRS, DOJ OIG and FBI at the Primary Residence in December 2018, we located twenty (20) non-FBI issued firearms at the residence.  According to the Automated Firearms System ("AFS"), a database maintained by the California state Department of Justice, as of April 18, 2020, BROUMAND has registered approximately 12 firearms.  BROUMAND's knowledge of FBI techniques and access to firearms further necessitates the need to discretely determine his physical location to safely effect the arrest.

112.    As a result of these challenges in ascertaining BROUMAND's location, combined with the information detailed above in this affidavit, I believe that there is probable cause and an operational need to obtain cell-site and GPS tracking from BROUMAND's cellular phone.

## VI.  CONCLUSION

113.    For all the reasons described above, there is probable cause to believe that BROUMAND has committed a violation of 18 U.S.C. § 371 (Conspiracy to Commit Bribery of Public Official).

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone
on this _21_ day of April, 2020.

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

41