E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MICHAEL J. MORSE (Cal. Bar No. 291763)
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Environmental & Community Safety Crimes Section
Assistant United States Attorneys
     1500/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-7367/0304
     Facsimile:  (213) 894-7631
     E-mail:     michael.morse@usdoj.gov
                 juan.rodriguez@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-224(A)-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S REDACTED SENTENCING POSITION; EXHIBIT |
| v. | Sentencing Date: February 27, 2023 |
| BABAK BROUMAND, | Time:         1:30 p.m. |
| Defendant. | Location:     Courtroom of the Honorable R. Gary Klausner |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Michael J. Morse and
Juan M. Rodriguez, hereby files its sentencing position for defendant
BABAK BROUMAND.

     This Sentencing Position is based upon the attached memorandum
of points and authorities, the exhibits attached hereto, the files
and records in this case, the Presentence Investigation Report

1   ("PSR") (Dkt. 267), and such further evidence and argument as the

2   Court may permit.

3   Dated: February 13, 2023        Respectfully submitted,

4                                  E. MARTIN ESTRADA
                                 United States Attorney

5

6                                  MACK E. JENKINS
                                 Assistant United States Attorney

7                                  Chief, Criminal Division

8                                      */s/*
                                 MICHAEL J. MORSE

9                                  JUAN M. RODRIGUEZ
                                 Assistant United States Attorneys

10

11                                  Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                           PAGE

TABLE OF AUTHORITIES...............................................2i

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.     INTRODUCTION................................................1

II.    FACTUAL BACKGROUND.........................................2

       A.    Overview of Conspiracy...............................2

       B.    Testimony of E.S. and Corroboration Presented at Trial....4

       C.    Testimony of FBI Special Agents Kusin and Davis..........6

       D.    Testimony of Defendant...............................8

             1.    Defendant's Meeting with Special Agent Kusin.........8

             2.    The Ducati and Demerol..............................9

             3.    Defendant's 2015 Lake Tahoe Vacation Home
                   Purchase...........................................10

             4.    Defendant's "Investment Properties"................11

             5.    H.N................................................11

             6.    Defendant Asks E.S. for $30,000 (2017).............12

             7.    Defendant's Other Testimony........................12

       E.    ████████████████████████████ ...................13

III.   THE PRESENTENCE INVESTIGATION REPORT.......................13

IV.    THE COURT SHOULD APPLY AN OBSTRUCTION OF JUSTICE
       ENHANCEMENT, PURSUSANT TO U.S.S.G 3C1.1 BECAUSE DEFENDANT
       PROVIDED FASLE TESTIMONY AT TRIAL.........................15

       A.    Legal Standard.......................................15

       B.    Defendant Testified Untruthfully at Trial.............16

V.     A SENTENCE OF 121 MONTHS AND THREE YEARS OF SUPERVISED
       RELEASE IS WARRANTED UNDER AN ANALYSIS OF THE 3553(A)
       FACTORS...................................................18

VI.    CONCLUSION.................................................21

1

**TABLE OF AUTHORITIES**

2    <u>DESCRIPTION</u>                                                    <u>PAGE</u>

3    **Federal Cases**

4    *Gall v. United States*,
5       552 U.S. 38 (2007) ......................................... 21

6    *U.S. v. Barbosa*,
        906 F.2d 1366 (9th Cir. 1990) ............................. 16
7
     *U.S. v. Bennett*,
8       975 F.2d 305 (6th Cir. 1992) .............................. 16

9    *U.S. v. Contreras*,
        937 F.2d 1191 (7th Cir. 1991) ............................. 16
10
     *U.S. v. Fu Chin Chung*,
11      931 F.2d 43 (11th Cir. 1991) .............................. 16

12   *U.S. v. Hernandez-Ramirez,*
        254 F.3d 841 (9th Cir. 2001) ........................... 15-16
13
     *U.S. v. Johnson*,
14      968 F.2d 208 (2d Cir. 1992) ............................... 16

15   *U.S. v. McDonough*,
        959 F.2d 1137 (1st Cir. 1992) ............................. 16
16
     *U.S. v. Soto-Lopez*,
17      995 F.2d 694 (7th Cir. 1993) .............................. 16

18   *U.S. v. Thompson*,
        962 F.2d 1069 (D.C. Cir. 1992) ............................ 16
19
     *United States v. Treadwell*,
20      593 F.3d 990 (9th Cir. 2010) .............................. 21

21   **Federal Statutes**

22   18 U.S.C. § 1957 ............................................... 1

23   18 U.S.C. § 201 ................................................ 1

24   18 U.S.C. § 371 ................................................ 1

     18 U.S.C. § 3553 ........................................... 18-19
25

26   **Other**

27   U.S.S.G. § 2C1.1 .............................................. 14

     U.S.S.G. § 2S1.1 .............................................. 14
28
     U.S.S.G. § 3C1.1 ....................................... 1, 14, 15

ii

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

3

## I.   INTRODUCTION

4

    After an 11-day trial, a federal jury found Defendant BABAK

5

BROUMAND ("defendant") guilty of Conspiracy to Commit Bribery of a

6

Public Official, in violation of 18 U.S.C. § 371; two counts of

7

Bribery of a Public Official, in violation of 18 U.S.C. §

8

201(b)(2)(C); and one count of Monetary Transaction in Property

9

Derived from Specified Unlawful Activity, in violation of 18 U.S.C. §

10

1957(a).[1]  As proven at trial, defendant conspired with an attorney,

11

E.S., who was connected to organized crime, and richly rewarded

12

defendant with cash, a $30,000 check, escorts, a Ducati motorcycle,

13

and hotel stays in exchange for defendant querying sensitive law

14

enforcement databases and sharing the results with E.S., in order to

15

help E.S. and his criminal associates avoid prosecution and law

16

enforcement monitoring.

17

    The United States Probation and Pretrial Services Office

18

("Probation") calculated a total offense level of 29 and a criminal

19

history category of I, resulting in a Sentencing Guidelines range of

20

87-108 months' imprisonment and one to three years' supervised

21

release.  (Dkt. 267, Pretrial Sentence Report ("PSR") ¶¶ 77-96, 98-

22

104.)  The government agrees with Probation's calculations.

23

Additionally, the government seeks an additional two-level

24

enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

25

This enhancement would result in a total offense level of 31 and with

26

    [1] Defendant was acquitted of Counts Four and Six, charging
defendant with Bribery of a Public Official and Monetary Transactions

27

in Property Derived from Specified Unlawful Activity, respectively.
These charges specifically involved a $30,000 cashier's check drawn

28

on an account held in the name of ARCA Capital, Inc., and payable to
defendant's mother.

a criminal history category of I, results in a Sentencing Guidelines range of 108-135 months' imprisonment.

With the government's requested obstruction enhancement, the Guidelines range of 108 to 135 months' imprisonment appropriately captures the severity and egregiousness of defendant's crimes and his staggering violation of the public's trust as a federal law enforcement officer.  Accordingly, the government respectfully requests that the Court sentence defendant to a Guidelines sentence of 121 months' imprisonment, three years' supervised release, a $400 special assessment, and a $30,000 fine, as well as an order for a money judgment in the amount of $137,859.64.

## II.   FACTUAL BACKGROUND

### A.   Overview of Conspiracy

Defendant is a former Special Agent of the Federal Bureau of Investigation ("FBI") and was assigned to a National Security squad in San Francisco, California.  (PSR ¶ 17.)  As a special agent, defendant had access to, among other things, restricted law enforcement databases and information.  (Id.)  Beginning no later than January 2015 and continuing through at least December 2018, defendant abused his federal employment for his own personal profit.

Specifically, defendant conspired with E.S., an attorney engaged in criminal conduct and associated with a criminal organization to commit bribery of a public official.  In exchange for cash, a $30,000 check, private jet flights, hotel stays, meals, and other items of value, defendant provided various services and official acts for E.S. (Id. ¶¶ 22-72.)  For example, defendant regularly looked up information in confidential law enforcement databases for E.S.  That information ranged from determining whether individuals E.S.

associated with, or was contemplating associating with, were under
investigation, to accessing information about and relaying
information to E.S. himself.

Evidence at trial showed the defendant, on several occasions,
violated his official duties in exchange for cash, checks, and other
things of value, by, *inter alia*, querying confidential law
enforcement databases without a legitimate law enforcement purpose
(Overt Acts ("OA") 1, 4, 7, 9, 20, 22, 23, 25, 27, 30, 47-47, 51-52,
54-55); disseminating confidential information obtained from law
enforcement databases to individuals involved in criminal activity
(OAs 1, 24, 26), which also helped criminals avoid detection and law
enforcement monitoring; drafting and submitting FBI reports that
contained false or misleading information (OAs 6, 48, 56); lying to
other FBI agents in the course of defendant's duties as an FBI agent
about matters concerning ongoing FBI criminal investigations (Kusin,
Adkins, Kelly); falsely representing to an off-duty Beverly Hills
Police Department Officer that the FBI needed a private investigator
to assist in an FBI investigation (OA 31); making contact with
individuals defendant knew to be subjects of ongoing criminal
investigations without notifying the FBI (Levon Termendzhyan and Sam
Solakyan); and engaging in criminal activity with E.S., including
accepting and having sex with paid escorts, furnished by E.S.

Additionally, through government witness FBI Special Agent
Michael Torbic, the government presented the jury with extensive
timeline evidence detailing defendant and his co-conspirators'
communications, defendant's many corrupt acts, including database
searches on behalf of E.S., and the payments clearly made in exchange
for those acts (Trial Exs. 212, 213, 214 (2015, 2016, and 2017

Timeline Summary Charts); <u>see also</u> Trial Exs. 201-203, 205 (Cash and Check Deposit Summary Charts prepared by FBI Forensic Accountant Joan O'Dowd)).  The government also introduced a $30,000.00 check executed at the direction of E.S. for the benefit of the defendant, which the defendant then funneled through his "Lovebugs" business checking account in an effort to disguise the true nature of the criminal proceeds.  (<u>See</u> Trial Ex. 156.)

To conceal the money derived from his corrupt partnership with E.S., defendant deposited the bribe payments, including large sums of cash, into a corporate bank account he controlled, Love Bugs, LLC. (PSR ¶ 20.)  To further conceal their corrupt relationship, defendant made false statements to financial institutions, the FBI and FBI agents, and conspired with E.S. to falsely portray E.S. as an FBI source.  (<u>Id.</u> ¶ 21.)

In sum, defendant monetized his access to sensitive law enforcement information for his own personal gain.

**B.    Testimony of E.S. and Corroboration Presented at Trial**

At trial, E.S. testified about the corrupt nature of his relationship with defendant, including that he paid defendant approximately $10,000.00 a month, and gave him other items of value, in exchange for protection.  E.S. testified that defendant provided protection to E.S. by, *inter alia*, accessing sensitive law enforcement databases at E.S.'s request, and attempting, or purporting to, enroll E.S. as an FBI confidential human source. Additionally, E.S. provided specific testimony regarding items of value he gave the defendant in exchange for the defendant agreeing to engage in acts that violated his official duties as a federal law enforcement officer.

1    For example, E.S. testified that in April 2015, E.S. was
2  illegally providing a Qatar royal family member with Demerol, a
3  federally controlled substance, in exchange for monetary compensation
4  in the hundreds of thousands.  E.S. asked the defendant to query the
5  individual in a law enforcement database to find out whether the
6  individual had ties to terrorism.  The defendant told E.S. it was
7  "okay" to do business with this individual.  As a "bonus" to the
8  regular monthly bribe payments E.S. had been providing to the
9  defendant, E.S. purchased a motorcycle for the defendant, paying over
10 $36,000.00.  E.S. testified that at some point he needed a new source
11 of supply for Demerol, and asked the defendant if he could help.  The
12 defendant offered to provide Demerol in "non-liquid form" to E.S. in
13 furtherance of the illicit drug transactions E.S. had been
14 conducting.  In corroboration of E.S.' testimony, the government
15 introduced Trial Exhibit 261, a text message between the defendant
16 and E.S.  In it, the defendant says his "guy has the medicine in non-
17 liquid form, should I get it?"  Both E.S. and the defendant testified
18 that the "medicine" referred to by defendant was, in fact, Demerol.

19   E.S. also testified that in April 2016, a criminal associate of
20 E.S., H.N., was arrested.  E.S. became concerned a criminal
21 investigation of H.N. may implicate E.S., since E.S. and H.N. had
22 engaged in credit card fraud for over a decade at that point.  E.S.
23 testified that he contacted defendant, then-corrupt Glendale Police
24 Department narcotics detective John Balian; then-corrupt Department
25 of Homeland Security ("DHS") federal agent Felix Cisneros.  The
26 government introduced Exhibit 210, a summary chart of text messages
27 between E.S. and the three men listed above.  In it, starting with
28 defendant, E.S. provides all three men with H.N.'s personally

identifying information.  E.S. testified he did this so that the three men could run H.N. in a law enforcement database to gather information and potentially interfere in any investigation that could implicate E.S.  E.S. testified that he initially thought the FBI was handling the investigation.  E.S. testified that he later told the defendant that, because DHS was handling the H.N. investigation, he would have Cisneros intervene instead of the defendant.

E.S. further testified that in 2017, the defendant asked E.S. for $30,000 to purchase intelligence that could then be sold to the United States government once the defendant retired from the FBI. The plan, according to E.S., was for E.S., the defendant, and another unnamed person to sell intelligence that the defendant would obtain while under the employ of the FBI, to the United States government after the defendant retired.  In corroboration, the government admitted Exhibit 267, which is a July 2017 text message string between the defendant and E.S.  In it, the defendant references "our project," and asks for $30,000 to be wired to his "Lovebugs" business account, an account the government alleged and the evidence at trial showed the defendant used to launder the criminal proceeds he received from E.S. in exchange for violating his official duties as a federal law enforcement officer.

C.    **Testimony of FBI Special Agents Kusin and Davis**

Los Angeles FBI Special Agent Stephen Kusin testified that in January 2015, he was the primary agent on an FBI criminal investigation of Levon Termendzhyan.  Kusin testified that, at the time, although Termendzhyan was the target of Kusin's investigation, the investigation was designated as "pending/inactive," due to resource allocation issues.  Nevertheless, Kusin testified that he

1  was interested in any leads or information related to Termendzhyan

2  that could potentially reignite the investigation.

3      Kusin testified that in early January 2015, defendant contacted

4  Kusin, purporting to have a "source," later identified as E.S., who

5  may have information pertinent to Termendzhyan, and Kusin's

6  investigation.  Kusin testified, and other evidence at trial showed,

7  that defendant traveled to the Los Angeles FBI building on a Friday

8  morning in January, purportedly to introduce Kusin to E.S.  Instead,

9  after meeting with Kusin for a few minutes, defendant left the FBI

10  building, met with E.S., failed to answer phone calls from Kusin for

11  hours, and then falsely told Kusin he had already returned to San

12  Francisco.  In reality, defendant stayed the entire weekend at the

13  luxury Montage Hotel in Beverly Hills as E.S.'s guest in a room

14  costing $1,500, and met with Termendzhyan for a dinner that lasted

15  hours and costed thousands of dollars.  Termendzhyan paid the tab for

16  defendant and others, including E.S.  Defendant never informed Kusin

17  that he met with the target of Kusin's investigation, and never

18  documented the meeting in any way.  Kusin testified that he would

19  have wanted to know that defendant, a San Francisco based FBI agent,

20  had met with Kusin's target, and that a fellow FBI agent meeting with

21  the target of another FBI agent's investigation without coordinating

22  with or informing the primary FBI agent of such a meeting would be

23  highly unusual.

24      FBI Special Agent Akil Davis, Kusin's supervisor, also testified

25  that investigations designated as "pending/inactive" are those that,

26  due to resource allocation issues, the FBI is not actively working.

27  However, "pending/inactive" investigations are nevertheless open

28  criminal investigations.  Thus, the FBI would still be interested in

7

obtaining, and potentially following, any new leads it became aware
of relevant to such an investigation, including the introduction of a
potential "source" who may be able to provide pertinent information.
Davis also testified that a fellow FBI agent meeting with the target
of another FBI agent's investigation without coordinating with or
informing the primary FBI agent of such a meeting would be highly
unusual.

D.   **Testimony of Defendant**

1.   Defendant's Meeting with Special Agent Kusin

Defendant testified that in early January 2015, he contacted
Special Agent Kusin in order to introduce Kusin to a potential
"source" who purportedly had information related to Kusin's
Termendzhyan investigation.  Defendant testified that when he met
with Kusin, Kusin told defendant that the Termendzhyan investigation
"was not active," and that he "wasn't really interested in Levon
Termendzhyan."  (Dkt. 271 at 28 (Trial Transcript of afternoon
session of September 28, 2022).)  Defendant claimed that despite
attempting to "force feed [Kusin] the potential source that could
report on [Termendzhyan], Kusin didn't want it."  (Id. at 28-29.)
Defendant repeatedly testified that Kusin "had no interest" in
Termendzhyan, even after defendant had traveled from San Francisco to
Los Angeles, and obtained multiple supervisory approvals to do so,
with the express purpose of introducing Kusin to E.S.  Defendant
testified that he was "very upset about" Kusin's disinterest in
Kusin's own target.  (Dkt. 272 at 91 ((Trial Transcript of afternoon
session of September 29, 2022).)  Defendant testified that he would
not have come to Los Angeles to meet with Kusin if he knew Kusin was
not interested in Termendzhyan.  (Id. at 60.)

8

1    Defendant admitted that after meeting with Kusin, E.S. picked
2    him up outside of the FBI building in a Bentley.  The two men then
3    went to E.S.'s house.  (Dkt. 271 at 31-32.)  Defendant further
4    admitted that Kusin had tried to call him repeatedly, and when
5    defendant finally called Kusin back, defendant told Kusin that he was
6    on his way back to San Francisco.  Defendant admitted that was a lie,
7    as he planned to, and in fact did stay in Beverly Hills for the
8    entire weekend.  (Id. at 33.)  Defendant also admitted to meeting and
9    spending several hours with Termendzhyan that weekend, without ever
10   telling Kusin of the meeting.  (Id. at 34-35.)

11            2.   The Ducati and Demerol

12   Defendant testified that in 2015, he traveled from San Francisco
13   to Los Angeles to purchase a used Ducati motorcycle.  (Id. at 37.)
14   According to the defendant, while in Los Angeles, he met with E.S,
15   who convinced him he should purchase a used bike from E.S.'s friend
16   "Steve" at a Ducati dealership in Beverly Hills.  (Id. at 44.)
17   Defendant explained that he went to the dealership with E.S. to
18   purchase a used Ducati, but while browsing for used motorcycles, he
19   and E.S. became separated.  The next time he saw E.S., E.S. was
20   "finishing up purchasing" a brand new $36,000 Ducati motorcycle for
21   defendant, along with a $4,000 helmet and accessories.  (Id.)
22   Defendant characterized this purchase as "a total surprise," and
23   despite arguing with E.S., and telling E.S. that he didn't "want to
24   take it," E.S. "convinced [defendant] to take it."  (Id.)

25   Regarding Demerol, defendant admitted that his text messages
26   with E.S., wherein defendant told E.S. his "guy [had] the medicine in
27   non-liquid form," referred to Demerol.  (Id. at 50.)  Despite
28   admitting to asking E.S. "should I get it?," defendant nevertheless

9

claimed he had no intention of supplying E.S. with the federally
controlled substance.  When asked why he sent the message, defendant
conveniently remarked "I was trying to get information" related to
national security.  (Id. at 50-52.)

          3.   Defendant's 2015 Lake Tahoe Vacation Home Purchase

     Defendant testified that, in 2015, he was attempting to secure a
mortgage loan to purchase a vacation home in Lake Tahoe, California.
(Id. at 52-53.)  After being notified by his mortgage broker that he
"needed to get rid of some debt" by selling a boat he owned,
defendant met with E.S. and asked for a $30,000 loan to pay off the
boat.  (Id.)  Defendant testified that he and E.S. did not
"memorialize [the loan] in any way."  (Id.)  Despite claiming that he
asked E.S. for a $30,000 loan, defendant further testified that the
amount he owed on his boat was actually $13,000.  (Id. at 58.)
Defendant further admitted that, during the mortgage loan application
process, he submitted a letter to a financial institution that
contained false information, and that he created and submitted a
fictitious bill of sale which falsely claimed he sold his boat to
E.S. for $30,000.  (Id. at 62-78.)  Defendant also conceded that he
failed to report the $30,000 "loan"[2] he received from E.S. on his
2015 calendar year FBI Security Financial Disclosure Form ("SFDF"),
and only retroactively reported it on his 2017 calendar year SFDF
after he received notification from the FBI Office of Professional
Responsibility that he was under investigation.  (Dkt. 272 at 28.)

_____

   [2] E.S. testified that the $30,000 was not a "loan"; rather, it
was payment to defendant as part of their corrupt relationship.

10

1              4.   Defendant's "Investment Properties"

2       Defendant testified that in 2015, he submitted a mortgage loan

3  application to purchase a home in Lake Tahoe.  (Dkt. 259 at 135

4  (Trial Transcript of morning session of September 29, 2022); see also

5  Trial Exs. 53 and 55.)  Defendant admitted that he submitted

6  documents claiming the home would be used as an investment property,

7  and he submitted a lease agreement to the bank in support of his loan

8  application, purporting to show that the home was to be leased.

9  (Dkt. 259 at 135-136; see also Trial Ex. 56.)  Defendant claimed that

10  his wife's cousins, Maria and Todd Whitson (hereinafter the

11  "Whitsons"), paid defendant rent.  (Dkt. 259 at 138.)

12       Defendant also testified about another home loan he applied for

13  in 2016.  (Dkt. 272 at 9.)  He testified that in 2016 he submitted a

14  mortgage loan application to Union Bank and attached a lease

15  agreement claiming that his Lake Tahoe home (the one he purchased in

16  2015) was being rented out.  (Id.)  In this application, defendant

17  again claimed that the Whitsons were renting the Lake Tahoe home.

18  (Id.)  When the Court asked the defendant "did [the Whitsons] ever

19  pay you rent for [the home]?" defendant responded, "they did pay us

20  rent."

21              5.   H.N.

22       Defendant testified that in April 2016, he received a text

23  message from E.S. containing the name and date of birth of H.N.  (Id.

24  at 6.)  Defendant testified that after receiving this text, he called

25  E.S. to get additional information, believing the information was

26  possibly pertinent to nation security.  (Id.)  When E.S. could not

27  articulate why the information he provided was relevant to national

28  security, defendant took no further action.  (Id.)  Defendant further

11

explained that the subsequent text he received from E.S., which read

"your moral support is priceless," probably related to marital advice

defendant had given E.S. when E.S. "got caught by his wife and

another woman." (Id. at 9.)

### 6. Defendant Asks E.S. for $30,000 (2017)

Defendant testified that in 2017, he was working a "high-

sensitive case" involving a source who "was requesting $40,000 to pay

off his debt in order for him to travel overseas" to "do what

[defendant] was asking him to do." (Dkt. 272 at 22.) Defendant

claimed that he asked E.S. for $30,000 since "the FBI was only

willing to pay...$10,000." (Id.) Defendant conceded that his

$30,000 request to E.S. was "a mistake," but he "really believed in

this case" and had "worked so hard." (Id.)

### 7. Defendant's Other Testimony

In order to explain away the large cash deposits shown to the

jury in the government's case in chief (see Trial Exs. 212, 213, 214

(2015, 2016, and 2017 Timeline Summary Charts; see also Trial Exs.

201-203, 205 (Cash and Check Deposit Summary Charts prepared by FBI

Forensic Accountant Joan O'Dowd), which the government alleged were

proceeds from cash bribes given to defendant by E.S., the defendant

testified that whenever he would pick up cash from his "Lovebugs"

hair lice business, he would store it in his desk at the FBI. (Dkt.

259 at 116.) Defendant testified that he would then make cash

deposits into his "Lovebugs" business checking account whenever he

"needed the cash." (Id.) Defendant testified that, at one point, he

had as much as $14,000 in his desk at the FBI, because "that's a very

safe place in the FBI office." (Id. at 40.)

1    Finally, defendant testified that, as an FBI Special Agent,

2  specializing in national security and recruitment of sources, he had

3  been "trained in the art of deception," meaning he was "taught how to

4  spin a story" when attempting to recruit sources.  (<u>Id.</u> at 54.)

5  Defendant explained that "there is only one way, one way, to get

6  someone to do something for you.  And that is to make them want to do

7  it."  (<u>Id.</u>)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  **III.  THE PRESENTENCE INVESTIGATION REPORT**

27    The PSR Grouped all the Bribery and Money Laundering Counts

28  together as one group.  (PSR ¶¶ 77-82.)  The PSR calculated a base

offense level of 14, pursuant to U.S.S.G. § 2C1.1(a)(1) because defendant was a public official.  (PSR ¶ 83.)  Four separate specific offense characteristics were then added to defendant's base offense level, and the government seeks an additional enhancement—obstruction of justice.

First, the PSR calculated a two-level increase, pursuant to U.S.S.G. § 2C1.1(b)(1), because the offense involved more than one bribe.  (Id. ¶ 84.) Second, an eight-level increase is applied for the value of the bribe payments over $95,000. (U.S.S.G. § 2C1.1(b)(2), § 2B1(b)(1)(E); PSR ¶ 85.)  Third, a four-level increase is added because defendant was a public official in a high-level decision-making authority or sensitive position.  (U.S.S.G. § 2C1.1(b)(3); PSR ¶¶ 86-88.)  Fourth, as a result of defendant's § 1957(a) convictions a one-level increase is applied for a total offense level of 29. (U.S.S.G. § 2S1.1(b)(2)(A); PSR ¶ 89.)  The government concurs with the PSR's calculations for Group One.

Additionally, a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, is warranted, because the defendant provided false testimony during trial.  If the Court applies this enhancement, defendant's total offense level would be 31.

The government also agrees with the Probation Office that defendant has zero criminal history points, placing defendant in Criminal History Category I.  (PSR ¶¶ 98-104.)  Based on a total offense level of 31, assuming the Court applies the obstruction of

justice enhancement, and a Criminal History Category of I, the

applicable Guidelines range is 108-135 months.[3]

Probation notes that defendant has sufficient resources, such as

properties and vehicles, and has the ability to pay a fine.  (PSR ¶

142.)  The government concurs in this assessment and recommends that

defendant pay a fine of $30,000.

## IV.  THE COURT SHOULD APPLY AN OBSTRUCTION OF JUSTICE ENHANCEMENT, PURSUSANT TO U.S.S.G 3C1.1 BECAUSE DEFENDANT PROVIDED FASLE TESTIMONY AT TRIAL

Defendant testified to a myriad of falsehoods, and provided a

plethora of convoluted explanations and versions of events, that defy

logic and common sense.  Because defendant's testimony, which was

given with the intent to improperly and materially attack the

government's case-in-chief, undermined the judicial proceeding and

attempted to deceive both the jury and the Court, an obstruction of

justice enhancement is appropriate.

### A.  Legal Standard

§ 3C1.1 directs sentencing Courts to increase a defendant's

offense level by two levels "[i]f the defendant willfully impeded or

obstructed, or attempted to impede or obstruct the administration of

justice during the investigation or prosecution... of the instant

offense."  U.S.S.G § 3C1.1 Application Notes 4(b) and (f) state that

an obstruction enhancement is warranted for "committing, suborning,

or attempting to suborn perjury" and for "providing materially false

information to a judge or magistrate."  See _U.S. v. Hernandez-_

_Ramirez,_ 254 F.3d 841, 843-44 (9th Cir. 2001) (false statement to

magistrate judge on financial affidavit in request for court-

---

[3] If the Court does not apply the Obstruction of Justice
enhancement, the applicable guidelines range is 87-108 months.

appointed counsel); <u>U.S. v. Soto-Lopez</u>, 995 F.2d 694, 699-700 (7th Cir. 1993) (false testimony at suppression hearing); <u>U.S. v. Bennett</u>, 975 F.2d 305, 308 (6th Cir. 1992) (false testimony during trial); <u>U.S. v. Johnson</u>, 968 F.2d 208, 215-16 (2d Cir. 1992) (suborning perjury); <u>U.S. v. Thompson</u>, 962 F.2d 1069, 1071-72 (D.C. Cir. 1992) (false testimony at trial); <u>U.S. v. McDonough</u>, 959 F.2d 1137, 1141 (1st Cir. 1992) (same); <u>U.S. v. Contreras</u>, 937 F.2d 1191, 1194 (7th Cir. 1991) (same); <u>U.S. v. Fu Chin Chung</u>, 931 F.2d 43, 45 (11th Cir. 1991) (same).  A district court's determination of obstruction of justice is a factual finding, reviewed for clear error.  <u>U.S. v. Barbosa</u>, 906 F.2d 1366, 1369 (9th Cir. 1990).

### B.  <u>Defendant Testified Untruthfully at Trial</u>

Prior to testifying, defendant took an oath to tell the truth and nothing but the truth.  And true to form, much like the oath he took with the FBI, he betrayed that oath.  Because defendant took the stand and, throughout his testimony, lied to the jury (and the Court) about material events and interactions, an obstruction of justice enhancement must be imposed.

For example, defendant lied about his interactions with Kusin. Defendant's testimony, that Kusin was uninterested in Termendzhyan, directly contradicted Kusin's trial testimony and sought to explain away vital government evidence.

The government argued, and the evidence showed, that defendant had no interest in (1) assisting Kusin with the Termendzhyan investigation or (2) introducing his "source" (E.S.) to Termendzhyan because defendant had a corrupt relationship with E.S. and he did not want the FBI to be aware of defendant's interactions with E.S. Defendant did not come to Los Angeles to meet with Kusin to discuss

16

the Termendzhyan investigation or defendant's "source."  Instead, as the evidence showed, defendant came to Los Angeles to enjoy the benefits of his corrupt relationship with E.S. (i.e., collect his $10,000 monthly bribe payment and enjoy a weekend on E.S.'s dime). Moreover, E.S. was not a "source;" throughout this criminal conspiracy, defendant used the ruse of E.S. being a potential "source" to disguise their illegal relationship.

Defendant sought to provide the jury with an innocuous (non-illegal) explanation for defendant's conduct.  Defendant wanted the jury to believe that he was "working" E.S., that he and E.S. were friends, that he had applied for paid time off that weekend and thus was not "on the clock" when he met with Termendzhyan, and that the reason he did not tell Kusin that he (defendant) met with Termendzhyan was because Kusin said Kusin was not interested, and not because of defendant's illicit dealing with E.S.  Simply put, defendant's testimony sought to directly undermine the government's evidence, including the testimony of government witnesses, by presenting an alternative narrative, attempting to paint Kusin as an FBI agent unconcerned with information related to the target of his own investigation.  However, the testimony of Kusin, FBI Special Agent Akil Davis, and other corroborating evidence at trial exposed defendant's testimony as a thinly veiled attempt to deceive the jury and the Court.

Similarly, defendant's testimony about the Demerol, the Ducati, the $30,000 payment from E.S. for the Lake Tahoe purchase, the text message defendant received from E.S. which stated "your moral support is priceless," among other events, were all lies meant to materially undermine and contradict the government's case-in-chief.  While

defendant certainly has a right to challenge the government's evidence and put on a defense, the defendant cannot do so through perjury, which is what happened here.

Defendant's testimony that he kept large amounts of cash in his desk at the FBI was designed to explain away large deposits which were not consistent with the amount of cash he received from his "Lovebugs" lice removal business.  Defendant sought to give the jury the false impression that he accumulated a "cash hoard" from his business, which he kept in his desk at the FBI, and deposited in many cases close in time to his meetings with E.S.  The notion that a nearly 20-year veteran of the FBI would keep up to $14,000 in his desk at work smacks of pure fantasy, intentionally imagined and conveyed to deceive the jury and the Court, thereby undermining the judicial process.  Defendant, who admitted he was "trained in the art of deception," attempted to deploy that very "skill" in an effort to deceive the jury.

Further, defendant's testimony regarding his "investment properties" is directly contradicted ███████████████████ ███████████████████████.  Specifically, when asked <u>directly</u> by this Court whether the Whitsons paid defendant rent for his Lake Tahoe home, defendant responded, "yes."  In so doing, the defendant, while under oath, lied to this Court directly and without hesitation.

In sum, defendant provided materially false trial testimony and an obstruction of justice enhancement is warranted.

**V.   A SENTENCE OF 121 MONTHS AND THREE YEARS OF SUPERVISED RELEASE IS WARRANTED UNDER AN ANALYSIS OF THE 3553(A) FACTORS**

The Section 3553(a) factors further support the government's proposed sentence of 121 months in prison.  In determining a

sufficient sentence, courts must consider the nature and
circumstances of the offense, as well as the history and
characteristics of the defendant. 18 U.S.C. § 3553(a)(1).  Courts
must also consider the need for any sentence imposed to adequately
punish, deter, and reflect the seriousness of the offense. 18 U.S.C.
§ 3553(a)(2).  It is paramount that a sentence also protects the
public.  The government submits that a 121-month sentence is
sufficient but not greater than necessary to account for the factors
set forth in 18 U.S.C. § 3553(a).

        The nature and circumstances of defendant's offenses support a
sentence of 121 months' imprisonment.  See 18 U.S.C. § 3553(a)(1).
There is no question that defendant's crimes were serious, spanned
years, and undermined public confidence in government institutions.
While working as a trusted federal law enforcement officer with
tremendous power, defendant sold his access to confidential law
enforcement databases.

        Defendant's history and characteristics further support the
requested sentence.  Unlike many of the defendants who appear before
this Court, defendant came from a stable, loving supportive two-
parent home; parents who emigrated from Iran, presumably in search of
a better life for themselves and their children, including the
defendant.  (PSR ¶¶ 106-109, 112-115.)  Defendant admits that he had
a "moderate or modest lifestyle with his family and that his basic
necessities were always met."  (Id. ¶ 116.)  Rather than build upon
this strong family foundation, defendant turned to a life of crime in
a manner that violates the public trust in law enforcement.

        Defendant's crimes were clearly motivated by greed and power.
As E.S. testified at trial, E.S. noticed that defendant had expensive

taste, was wearing a Rolex watch and Gucci belt, and saw an opportunity to recruit defendant to help E.S. evade law enforcement detection.  E.S. then began cultivating a friendship with defendant. E.S. eventually asked defendant if he would be willing to "do something on the side" to make some additional money, an offer that defendant accepted, which began the corrupt agreement.  By early 2015, E.S. began paying defendant approximately $10,000 per month for information and protection.

Additionally, defendant made a myriad of false statements to conceal his corrupt relationship with E.S., including to Stephen Kusin, the Los Angeles FBI agent in charge of the FBI's investigation of Termendzhyan, who testified at trial.  Early in the conspiracy, defendant arranged to travel to Los Angeles on a Friday morning purportedly to introduce the Los Angeles-based FBI agent to a "source" (i.e., E.S.).  Instead, after meeting with the Los Angeles agent for a few minutes, defendant met with E.S., failed to answer phone calls from the Los Angeles Agent for hours, and then falsely told the agent he had already returned to San Francisco.  In reality, defendant stayed the entire weekend at the luxury Montage Hotel in Beverly Hills as E.S.'s guest in a room costing $1,500.

Moreover, because of his security clearances, defendant was required by Presidential Order and FBI policy to complete annual financial disclosure forms.  Defendant filed financial disclosure forms for 2015-2017, which failed to disclose that E.S. gave him the Ducati, cash, and the $30,000 check for which he was convicted.  It was only in 2018, shortly after the DOJ-OIG informed defendant that he was under investigation, in an attempt to further conceal the conspiracy, that defendant finally reported the receipt of a $30,000

"loan" from E.S., albeit over 2 years late and falsely characterized as a "loan." Simply put, defendant's conduct is a grievous breach of the public trust.

A 121-month Guidelines sentence is sufficient but not greater than necessary to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

Finally, a sentence near the mid-point of the Guidelines range will also prevent unwarranted sentencing disparities between this defendant and similarly situated defendants. See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010), overruled on other grounds by United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity[.]'"); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Accordingly, the government submits that, on balance, these factors weigh in favor of a sentence near the mid-point of the Guidelines range.

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 121 months in prison, followed by 3 years of supervised release, order that he pay a $400 special assessment, a $30,000 fine, as well as impose a $137,859.64 money judgment.

## **Exhibit 1**

**[REDACTED EXHIBIT]**